SAC AND FOX INDIANS OF THE MISSISSIPPI IN IOWA *v.* SAC AND FOX INDIANS OF THE MISSISSIPPI IN OKLAHOMA, AND THE UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 614. . Argued December 14, 15, 1910.—Decided April 24, 1911.

The provision in the act of August 30, 1852, c. 103, § 3, 10 Stat. 41, 56, forbidding payment of Indian annuities to any attorney or agent and requiring the same to be paid to the Indians or to the tribe did not give any vested rights to the Indians but was a direction to agents of the United States.

In the Indian treaties under consideration in this case the Government dealt with the tribes and not with individuals, and the treaties gave rights only to the tribes and not to the members.

Under the act of Mar. 1, 1907, c. 2290, 34 Stat. 1055, authorizing this suit, the action is analogous to one at law to recover money paid under mistake of law or fact, rather than one in equity, and this court follows the rule not to go behind the findings of the Court of Claims. *United States* v. *Old Settlers*, 148 U. S. 427, distinguished.

45 Ct. Cl. 287, affirmed.

THE facts, which involve the determination of the status of Sac and Fox Indians under certain treaties and statutes, are stated in the opinion.

*Mr. Charles H. Merillat,* with whom *Mr. Charles J. Kappler,* *Mr. George R. Struble, Mr. H. F. Stiger* and *Mr. William O. Belt* were on the brief, for appellants.

*Mr. Barry Mohun,* with whom *Mr. A. R. Serven* and *Mr. R. W. Joyce* were on the brief, for appellee Indians.

*Mr. Assistant Attorney General John Q. Thompson,* with whom *Mr. George M. Anderson* was on the brief, for the United States.

MR. JUSTICE HOLMES delivered the judgment of the court.

This is a suit brought by the Sac and Fox Indians of the Mississippi in Iowa against the Sacs and Foxes in Oklahoma and against the United States, under the act of March 1, 1907, c. 2290, 34 Stat. 1055. That statute gave "full legal and equitable jurisdiction, without regard to lapse of time," to the Court of Claims to hear and determine "as justice and equity may require, with right of appeal" to this court, all claims of the plaintiffs against the defendants for their alleged "proportionate shares, according to their numbers," not already paid to or for them, of appropriations for fulfilling treaty stipulations, or arising from the disposal or sale of the tribes' lands, including certain claims to be stated. Reports of Departments printed as Congressional documents are made evidence, to "be given such weight as the court may determine for them." The claims made are (1) for annuities between 1855 and 1866, both inclusive; (2) for the difference between the sums paid and those alleged to have been due from 1867 to 1884; (3) for a similar difference from 1884 to date; (4) for a sum alleged to be due for pay of the plaintiffs' chiefs; (5) for the plaintiffs' share of the proceeds of tribal lands disposed of under a treaty of 1859. The case was heard on the evidence furnished by the above mentioned documents, the petition was dismissed, and the plaintiffs took this appeal. 45 Ct. Cl. 287.

The facts found by the Court of Claims, abridged, are as follows. Under the treaty of October 11, 1842, 7 Stat. 596, the tribes in question ceded the land then occupied by them in the Territory of Iowa, were assigned a tract in what now is Kansas, and removed thither in 1845, 1846; then numbering 2278, and, in 1851, 2660 persons. In 1855 and from 1862 to 1866 certain members, number unknown, without permission from the United States, re-

turned to what had been a part of the Iowa reservation. Their motives are immaterial.  On July 15, 1856, the legislature of Iowa passed an act giving the consent of the State that the Indians (Sacs and Foxes) 'now residing' in Tama County, but none others, be permitted to remain there; providing for a census, and requesting the Governor to inform the Secretary of War and urge the payment to such Indians of their proportion of the annuities due or to become due to the tribe.  The number of Indians embraced in the act does not appear.  From 1855 to 1866 there was no agent of the United States with the Iowa band, although its existence was known.  A special agent took a census on May 31, 1866, which gave the whole number as 264 and he spent on account of annuities for them $5,359.06.  Except this sum, all the annuities and other monies of the tribe were paid out at the Sac and Fox agency, Kansas.  Whether any Indians returned to Kansas and received payments there does not appear.  At this time, up to 1867, annuities were paid subject to the act of August 30, 1852, c. 103, § 3, (10 Stat. 41, 56), which forbade payment to be made to any attorney or agent and required it to be made directly to the Indians themselves or to the tribe per capita, "unless the imperious interest of the Indian or Indians, or some treaty stipulation, shall require the payment to be made otherwise, under the direction of the President."  The policy and practice of the Government were to pay no annuities to Indians absent from reservations without leave, as were the Iowa band, and nothing to the contrary is implied by the act of 1852.

We interrupt the recital of facts to dispose at this point of the first claim made by the plaintiffs.  The act of 1852 gave no vested rights to individuals.  It was not a grant to the Indians but a direction to agents of the United States, subject to other directions from the President. See *Wisconsin & Michigan Ry. Co.* v. *Powers,* 191 U. S.

379, 387. The Government did not deal with individuals but with tribes. *Blackfeather* v. *United States*, 190 U. S. 368, 377. See *Fleming* v. *McCurtain*, 215 U. S. 56. The promises in the treaties under which the annuities were due were promises to the tribes. Treaties of November 3, 1804, 7 Stat. 84; October 21, 1837, 7 Stat. 540; October 11, 1842, 7 Stat. 596. See treaty of October 1, 1859, 15 Stat. 467. So the treaty of February 18, 1867, in article 21, speaks of "the funds arising from or due the nation under this or previous treaty stipulations," and of payments to bands. 15 Stat. 495, 504. Moreover, when the Government decided to pay only at the tribal agency, and then paid the whole amount due, we must presume, at this distance of time, that its decision was made under the direction of the President. The Court of Claims adds as yet a further reason for rejecting this claim that it does not appear how many of the Iowa Indians returned to Kansas to receive their annuities, but (therein varying from the statement of facts found), that it does appear that some of them did. The course of the Government is sanctioned in principle by the implication of the treaty of October 1, 1859, article 7, 15 Stat. 467, 469. That article recites the anxiety of the Sacs and Foxes that all members of the tribes should share the advantages of the treaty, invites non-resident members to come in and provides for notice to them, but adds the condition that those who do not rejoin and permanently reunite with the tribe within one year shall not have the benefit of any of the stipulations in the treaty contained.

On February 18, 1867, another treaty was made, amended September 2, 1868, proclaimed on October 14, 1868, 15 Stat. 495, by which the tribes sold their lands in Kansas to the United States and agreed to remove to a reservation in what now is the State of Oklahoma. Article 21 was like article 7 of the treaty of 1859, just mentioned, with a condition that no part of the funds

due to the nation under this or previous treaties should be paid to any bands or parts of bands not permanently residing on the reservation, except those residing in Iowa. 15 Stat. 504. The soon following Indian appropriation act of March 2, 1867, c. 173, 14 Stat. 492, 507, provided, as permitted by the treaty of 1859, art. 6, that the band of Sacs and Foxes "now in Tama County, Iowa, shall be paid pro rata, according to their numbers, of the annuities, so long as they are peaceful and have the assent of the government of Iowa to reside in that State." This is subject to the same comment as the act of 1852 when relied upon as a foundation for individual rights under it. From 1867 through 1884, the Iowa Indians were paid $11,174.66 as their proportion of the annuities, although they protested and for a time refused to receive the same. The matter was settled by a clause in the act of May 17, 1882, c. 163, 22 Stat. 78, "That hereafter the Sacs and Foxes of Iowa shall have apportioned to them from appropriations for fulfilling the stipulations of said treaties no greater sum thereof than that heretofore set apart for them." This by implication ratified the previous estimates and leaves no more to be said as to the second claim—(for the time from 1867 to 1884). It is suggested to be sure that the act of 1882 was repealed by the act of 1884, but as will be seen directly it was not repealed so far as it affected this claim. After the act of 1882 the Iowa Indians consented to receive the apportioned sum. We may add that there is nothing to show that all the Indians that had the assent of the government of Iowa given by the act of 1856 to their residing there were not paid their full share.

By the act of July 4, 1884, c. 180, 23 Stat. 76, 85, after an appropriation for interest payable under the treaty of 1842, it was provided that thereafter the Iowa Sacs and Foxes should have apportioned to them, from treaty appropriations, "their per capita proportion of the amount

appropriated in this act, subject to provisions of treaties with said tribes; but this shall apply only to the Sacs and Foxes now in Iowa: *And provided further*, That this shall apply only to original Sacs and Foxes now in Iowa to be ascertained by the Secretary of the Interior." As to the word ' original ' we may compare the proviso in the Act of March 2, 1867, stated above. The Secretary of the Interior ascertained the number to be 317 and the number on the Oklahoma reservation to be 505 in 1884 and 513 in 1887. He accordingly apportioned the proper fund in the proportion of 317 to 505 in 1885 and 1886, and afterwards, to 1907, in the proportion of 317 to 513.· The plaintiffs attempt to go behind this ascertainment by the Secretary. But here for a third time we are dealing with a statute, not with a treaty. There is no intimation of an intent to change the terms of the treaties by which the contracts were made not with individuals but with the tribes. The statute neither changed nor conferred rights. It simply directed the Secretary of the Interior how the contracts of the United States should be performed. They were performed as directed, to the seeming satisfaction of the representatives of the contractees, and there is an end of the matter. Here again we may add that although it is argued that the evidence shows that the Secretary's estimate was too small for years after 1887, the evidence does not show that the additional Indians were or represented original Sacs and Foxes "now [i. e. on July 4, 1884,] in Iowa." This disposes of the third claim.

However, the Iowa Indians not being satisfied and having presented a memorial to Congress setting up their present claims except that for pay of their chiefs, the act of March 2, 1895, c. 188, 28 Stat. 876, 903, directed the Secretary of the Interior to ascertain whether under any treaties or acts of Congress any amount was justly due to them from the members of the tribe in Oklahoma by reason of any unequal distribution. The Secretary found

that a certain sum was due from the amount appropriated by act of April 10, 1869, c. 16, 16 Stat. 13, 35, in payment for the Kansas lands ceded by the treaty of 1867, but nothing more. This sum was paid. Act of June 10, 1896 c. 398, 29 Stat. 321, 331.

The fourth claim is based upon article 4 of the treaty of 1842, by which it was agreed that each of the principal chiefs should receive five hundred dollars annually, "out of the annuities payable to the tribe, to be used and expended by them for such purposes as they may think proper, with the approbation of their agent." This like the rest of the treaty was a promise not to the chiefs but to the tribe, gave the chiefs no vested rights and was subject to such qualification in its performance as to the parties might seem fit. Whether a payment to Iowa chiefs would have been performance may be doubted, and certainly if the parties saw fit to treat the chiefs on the reservation as the only ones to be paid, no one else has anything to say. The act of May 31, 1900, c. 598, 31 Stat. 221, 245, directed the Secretary of the Interior to pay a named Iowa head chief five hundred dollars a year, during the remainder of his life, beginning with and including the fiscal year 1900, in accordance with the terms of article 4 of the treaty of 1842, but that is not enough to establish that he had been guilty of mistake in not making the same payment before the time that he was ordered to begin.

The fifth and last claim is for a share in proceeds of land ceded by the treaty of 1859. As to this the Court of Claims finds it impossible to ascertain what sum if any is due or to whom it would be payable. We do not see how the claim can be supported when the treaty itself provided that to benefit by it members must rejoin the tribe, meaning the tribe in Kansas, within one year. It is suggested to be sure that the forfeiture as it is called, was dependent upon notice being given as agreed in article 7, and that there is some evidence that notice was not given. The

condition however was an absolute condition precedent
to the acquisition, by persons not parties to the treaty, of
any rights, if rights they can be called, notice or no notice;
and furthermore if the question were open we should not
be prepared to find that there was a failure in that respect.
See *United States* v. *Crusell*, 14 Wall. 1; *United States* v.
*Pugh*, 99 U. S. 265. *New York Indians* v. *United States*,
170 U. S. 1, has no bearing. There the question was
whether grantees in fee simple by treaty had forfeited
their rights.

The plaintiffs contend that, as the act authorizing the
suit gave the Court of Claims full legal and equitable ju-
risdiction, the appeal opens the findings of fact for recon-
sideration, as was held in *United States* v. *Old Settlers*, 148
U. S. 427, 464, 465. That, however, was a suit in equity,
whereas the present case is more analogous to an action
at law, to recover a fund from parties to whom it was paid
under mistake of law or fact, or from the original con-
tractor by whom the payment was made. We should hes-
itate to depart from the ordinary rule that we do not go
behind the findings of the Court of Claims, *The Sisseton &
Wahpeton Indians*, 208 U. S. 561, 566, if, in our view, the
question needed to be decided. It is true that the court
below stated a principle of evidence that, if it is to be
taken literally, cannot be sustained. It said that coun-
sel could not bind the court to admit evidence not admis-
sible by law, and partly on that ground seems to have
declined to consider *ex parte* affidavits which the counsel
for the Iowa and Oklahoma Indians agreed might be given
the effect of depositions. The counsel for the United
States refused to agree, and this was a further, and pos-
sibly adequate ground for the exclusion, as the agreement
may have been understood to be conditional upon all par-
ties joining. But of course evidence, hearsay or *ex parte*,
for instance, may be admitted by consent, unless perhaps
as against the United States, and then should be given

whatever weight it would have but for technical rules. Apart from agreement the depositions were not made evidence by the statute of 1907, as that only dealt with reports of Departments, not with every exhibit that such reports might contain.

The question remains whether the error, if error there was, did the plaintiffs any harm. The counsel for the plaintiffs treats the statute giving jurisdiction as intended to open the case from the beginning without regard to inconsistent statutes and to provide for an arbitration on the footing of what may seem fair. See *United States* v. *Old Settlers,* 148 U. S. 427, 428, 429, 473. *Phineas Pam-To-Pee* v. *United States,* 148 U. S. 691, 699. In view of the subject-matter an uneasy doubt is natural whether Congress did not mean rather more than it plainly said. But the jurisdiction given is 'legal and equitable' and the authority is to 'adjudicate as justice and equity shall require' claims for money alleged 'to be due to them as their proportionate shares' of appropriations to fulfill treaty obligations, etc. The statute creates no new right beyond excluding the effect of the lapse of time and, perhaps, the defence of *res judicata* and satisfaction under the acts of 1895 and 1896; it makes no admission, but simply provides for a trial on the merits. See *Stewart* v. *United States,* 206 U. S. 185, 194. A merely moral claim is not made the foundation of a possible recovery. Something must be shown that amounts to a right.

It is apparent from what we have said that no finding as to the number of Indians in Iowa in particular years, without more, could change the result to which the Court of Claims and this court have come. The treaty contracts on which the plaintiff's claims are founded gave rights only to the tribe, not to the members. It was an accepted and reasonable rule, especially in the days when Indians' wars still were possible and troublesome, that payments to the tribe should be made only at their reservation and

to persons present there. The acts of 1852 and 1867 did
not shift the treaty rights from the tribe to the members,
create new rights or enlarge old ones. The payments up
to 1884 had the sanction of statute. The act of 1884 no
more created individual rights than did the acts of 1852 and
1867. It confined its benefits to "original Sacs and Foxes
now in Iowa," and made the Secretary of the Interior the
judge. There is no evidence to show that he was wrong
as to the number of original Sacs and Foxes who had been
in Iowa on July 4, 1884. Whether the plaintiffs might get
an award in a free arbitration, irrespective of treaty and
statute, we cannot say, but in our opinion they have failed
to establish such rights as can be recognized by this court.
The decision below was according to the long established
construction and practice of the Department, a fact en-
titled to much weight in a case like this.

*Judgment affirmed.*


MR. JUSTICE McKENNA, dissenting.

1. On the supposition that the findings of the Court of
Claims are binding on this court, the case should be re-
manded to that court for further consideration because of
its error in refusing to consider evidence made competent
by the jurisdictional act and by the stipulation between
the contending Indians.

2. If this court may go behind the findings, as I think
it may on the authority of *United States* v. *Old Settlers,*
148 U. S. 464, and as it is conceded by the contending In-
dians that it may, in my opinion the Secretary of the In-
terior, in apportioning the annuities from 1885 to date,
committed error in taking the fixed, unvarying sum of 317
for the Sacs and Foxes in Iowa, and 505 for those in Okla-
homa, disregarding any increase or decrease of the respec-
tive divisions of the tribe. The tribal rights of the claim-
ant Indians had been recognized, and the jurisdictional

act required that they should be given "their proportionate shares according to their numbers . . . of the appropriations made by Congress for fulfilling treaty stipulations with the confederated tribes. . . ."

I think, therefore, that a fixed, unvarying sum should not have been selected. Annual tests should have been made and the increase or decrease of the Indians ascertained by the Secretary of the Interior.

The Court of Claims found, it is true, that there was no competent evidence of the increase or decrease of the divisions of the tribe. But in so finding the court disregarded, as I have already said, evidence which the jurisdictional act and the stipulations of the contending Indians made competent, and such evidence, though not strong, established that the claimant Indians had increased. It is pointed out in the opinion that the Secretary of the Interior recognized a small increase of the defendant Indians in 1887.