**SAMPSELL v. ANCHES et al.**
**In re GOLD.**
**No. 9059.**

Circuit Court of Appeals, Ninth Circuit.

Dec. 18, 1939.

Rehearing Denied Feb. 15, 1940.

946

Craig & Weller and Frank C. Weller by Thomas S. Tobin, all of Los Angeles, Cal., and Stern, Orton & Stern, by Leopold M. Stern, all of Seattle, Wash., for appellant.

D. G. Eggerman, Edw. L. Rosling, and DeWitt Williams, all of Seattle, Wash. (Eggerman & Rosling, of Seattle, Wash., of counsel), for appellee.

Before WILBUR, HANEY, and HEALY, Circuit Judges.

WILBUR, Circuit Judge.

This action was brought by the trustee in bankruptcy for the estate of Sam Gold, bankrupt, to recover the value of certain merchandise purchased by the defendants and appellees from the bankrupt, Sam Gold, within four months of the date of bankruptcy. It is claimed by the appellant that the sales of the merchandise to the appellees were made with intent on the part of the bankrupt to defraud his creditors and that the appellees, as such purchasers, also intended to defraud the creditors of the bankrupt, that the purchases by them were not made in good faith or for a present fair consideration (11 U.S.C.A. § 107, sub. e), and that the purchasers were not bona fide holders for value prior to the date of adjudication (11 U.S.C.A. § 110, sub. e).

The plaintiff alleged that the fraudulent scheme conceived and executed by the bankrupt was one by which he purchased great quantities of merchandise on credit without any intent to pay the creditors from whom he had purchased the goods but, on the contrary, with intent to quickly sell the goods for cash and appropriate to his own uses the cash thus procured and, then, to go into bankruptcy.

A promise to pay for goods purchased without an intention to do so is a fraud especially denounced by the statutes of California (Cal.Civ.Code §§ 1572, 1710) and in most jurisdictions such a promise is itself fraudulent.

HANEY, Circuit Judge, dissenting.

The complaint alleges in detail the means adopted to carry out the scheme of the bankrupt to appropriate to his own use the goods purchased by him on credit. That scheme, briefly, is as follows:

Appellant was in the business of jobber of what is known to the trade as distress merchandise. He had thus established a line of credit. He purchased in a different location in Los Angeles a retail business, in the retail district, for the price of $11,000. He immediately began purchasing goods on credit in many eastern cities and in Los Angeles, in quantities wholly disproportionate to the business he had purchased. Some of the merchandise purchased by him was resold by him to appellees, almost as soon as it arrived, for a 31.94 per cent discount below the cost to him. It is alleged that goods which were purchased by the bankrupt for $34,102.47 were immediately resold at Los Angeles to the appellees for $23,208.47; that in many instances goods received at the bankrupt's place of business in Los Angeles by freight from the eastern cities where they had been purchased were immediately transshipped to the defendants' place of business in Seattle.

It is alleged that throughout the period when the sales to the appellees were being made, the retail store purchased by the bankrupt was doing a large business, and that the records of the sales of that store (and of another store of the bankrupt) were destroyed to conceal the amount of the daily receipts.

It is alleged that the bankrupt utilized the money received from the appellees to make partial payments to creditors in and around Los Angeles to prevent them from suing on their claims or attaching his property and thus giving the bankrupt an opportunity to appropriate and conceal the cash derived by him from sales at his retail stores.

It is admitted in the pleadings that the purchase money paid by the defendants was applied to outstanding obligations of the bankrupt.

It is alleged that during the period from January 1, 1937 to July 13, 1937, the defendant purchased $168,741.99 worth of goods; that he made an assignment for the benefit of creditors on July 7th, and that a petition in involuntary bankruptcy was filed with the District Court on July 7, 1937; that the bankrupt's stock in trade had been depleted to $44,846.

The appellees, before answering the complaint, called for a bill of particulars as to the goods which had been purchased by them. The allegations of the complaint with reference to the goods purchased were very specific but the bill of particulars was much more so. The defendants answered and admitted the purchase of the goods described in the bill of particulars and admitted that the purchase price paid in cash by the defendant to the bankrupt was the amount stated in the complaint ($23,208.47). The appellees, for lack of information and belief, denied that the goods purchased by them were the same goods which had been so recently purchased by the bankrupt.

The complaint consists largely of allegations of evidentiary matter but it is clear on the whole that the gist of the charge of fraud in the complaint is the purchase of large quantities of goods without any intention of paying therefor, and the specific intent of preventing the purchaser from obtaining relief by the use of the bankruptcy laws.

The case went to trial before a jury on August 1, 1938 and, at the conclusion of the appellant's evidence on August 5, 1938, the court instructed the jury to return a verdict in favor of the defendants. This ruling was excepted to and designated as a point upon which the appellant intended to rely on appeal. On the presentation of the case on appeal, however, the appellant does not press this point but, on the contrary, concedes that the instruction was proper under the status of the evidence at the conclusion of plaintiff's case and, consequently, relies upon twenty-five points wherein he claims that the trial court erred in excluding evidence he offered.

In order to consider these points it will be necessary to state more fully the condition of the record but, before doing so attention should be called to the way in which this case is presented to this court.

Judgment was entered August 10, 1938. The case was tried before the Federal Rules of Civil Procedure (Rule 85) became effective (Rule 86) September 16, 1938. 28 U.S.C.A. following section 723c. The record on appeal was made after the new rules became effective, and an attempt was made to comply with those rules, particularly rule 75, in the preparation of the record. The appellant, on November 9, 1938, served a notice designating the portion of the record, proceedings and the evidence to

be contained in the record on appeal (Rule 75(a). Thereafter, the appellee served a designation of the additional portion of the record, proceedings and evidence to be included in the record. The parties, however, abandoned this method of making up the record and filed a stipulation under the provisions of Rule 75 (f) wherein the parties designated the parts of the record, proceedings and evidence to be included in the record on appeal. This stipulation specified with reasonable certainty the parts of the reporter's transcript and of the, pleadings and documents to be included in the record on appeal. One of the provisions of this stipulation was that 46 original exhibits be forwarded in accordance with the order of the District Court of November 19, 1938. These exhibits are not designated in any other way than by number. Incorporated in the stipulation is a "note to the clerk of the appellate court". This note indicates the portions of the reporter's transcript and supplemental transcript that shall be printed.

Several of the "points" on which appellant intends to rely on appeal relate to the exclusion of exhibits. For instance, point 1 is as follows: "That the District Court erred in excluding from evidence plaintiff's Exhibit 7 for identification."

The record on appeal consists of the portion of the reporter's transcript, the dockets and exhibits covered by the stipulation between the parties. None of these exhibits have been printed as parts of the record on appeal. Under our rules (Rules 19 and 20) with relation to the printing of records and briefs only those parts of the record on appeal which are printed are to be considered by this court. Rule 19, sub. 6 provides: "The clerk shall print those parts only; and the court will consider nothing but those parts, of the record * * *".

Both parties assume that these 46 exhibits are before us for our consideration, but our rules provide that if not printed they shall not be considered. Our Rule 20 D provides for a specification of the errors relied upon and provides that "when the error alleged is the admission or rejection of evidence the specification shall quote the grounds urged at the trial for the objection and the full substance of the evidence admitted or rejected and refer to the page number in the printed or typewritten transcript where the same may be found."

It will be observed that this requirement as to form of the specification of errors is more specific than the requirement of a "statement of points" to be relied upon on appeal contained in Rule 19 of this court with reference to the printing of the "record on appeal" (Rule 19-6), and that of Rule 75 (d), supra, with reference to the "statement of points" on which appellant intends to rely. In his brief the appellant in this case has wholly disregarded our Rule 20D with regard to specification of errors relating to the rejection of evidence.

■ The brief contains no specification of errors whatever but takes up seriatim the points designated by appellant in the lower court under Rule 75 (d), supra. These "points" are designated and discussed by number in some instances and in others there is a brief "statement of the point". There could be no objection to the use of the word "points" instead of "specifications" in complying with our rule 20 D, but the purpose of the rule with reference to the character of the specifications in the brief is to facilitate the study, consideration and determination of the specific errors relied upon on appeal. The only other limitation upon the number and character of the specifications of error in an appellant's brief is that contained in Rule 19 (6) providing that the court will consider nothing but the "points to be considered on appeal" as stated in the direction to the clerk of this court to print the record. If the "points" upon which the appellant intends to rely on the appeal which are served upon the clerk of the District Court, or the "points upon which the party intends to rely contained in the statement to the clerk of this court", are as definite as is required by our rule for the specifications of errors to be contained in the brief, there could be no objection to the use of them in the brief.

■ As we have pointed out, the 46 exhibits are not printed and, although a part of the record in this court, should not be considered by us.

The statement of points to be relied upon on appeal, filed in the lower court, does not set out the substance of the exhibits offered and rejected but merely refers to the exhibit by number.

Inasmuch as none of the specifications of error designated as "points" in appellant's brief comply with our rules concerning the specifications of error relating to

the admission or rejection of evidence, the question arises as to the proper disposition of the case.

While the court would be fully justified in affirming the judgment or dismissing the appeal where the appellant has failed to specify errors in his brief in accordance with our rules, it would be less harsh to require the briefs to be rewritten, if a consideration of the briefs indicates there is any probability that the appeal is meritorious.

█ In view of the fact that the procedure, both in the lower court and on appeal concerning the preparation and printing of the record on appeal is new and some confusion may have resulted from three different requirements concerning the points or errors to be relied upon on appeal, we will consider the record on appeal. In doing so we will also consider certain exhibits even though they have not been printed and there has been no permission granted to dispense with the printing thereof.

We have concluded in the case at bar that appellant's point 13 discloses a prejudicial error which requires a reversal. In view of this we will not require the brief to be amended but will deal with this point sufficiently to show the error of the trial court and its prejudicial character. Point 13, as filed with the District Court, is as follows:

"That the District Court erred in sustaining the objection of the defendants to the question asked the witness, Walter F. Stern, at page 528 of the Reporter's transcript, as follows:

"Q. And when you made an examination of a box and a certain lot in Mr. Anches' place of business, did Mr. Anches tell you what was in the rest of the boxes in the same lot?

"Mr. Eggerman: I object to that question—

"Q. (Interrupting) Yes or no?

"Mr. Eggerman: (Continuing)—as too vague and indefinite.

"The Court: Yes. You had a right to inquire what was said between them in that connection, what statements were made by Mr. Anches during the examination that the witness was carrying on. This merely calls for his interpretation or conclusion.

"Mr. Tobin: Is the objection sustained?

"The Court: Yes, it is sustained.

"Mr. Tobin: Exception."

This question, it will be observed, is purely preliminary to the introduction of the conversation. As the court stated in its ruling that the attorney had a right to inquire as to what was said between them in that connection it would seem that the door was open for the attorney to proceed with the examination of the witness in order to ascertain what was said by the defendant at the time and place in question and that, therefore, the ruling, although clearly erroneous, was without prejudice. But an examination of the record shows that the appellant was blocked in his effort to do so.

The witness was examined as follows:

"Q. All right. Now, when you would examine a box in a certain lot containing certain merchandise, will you please tell us what, if any, conversation you had with Mr. Anches on each of those occasions?

"Mr. Eggerman: That is objected to as too vague and indefinite. A certain box and a certain lot."

The objection was sustained and an exception reserved, whereupon the court explained its ruling as follows:

"You must have a definite statement with reference to a specific lot. You should proceed according to your complaint. You have designated twenty transactions involving certain merchandise. The defendants have admitted the sales on those dates of the merchandise described. Now, we cannot go afield. You must confine the proof to one of these specific instances and show by proof that the invoice or the lot related to some portion of the goods involved in the instant case. You will see my point if you will read your pleading on pages 7 and 8."

The appellant sought to elicit evidence from one of the defendants which would identify goods purchased by the defendants as the same goods the bankrupt had recently purchased at a higher price. He sought to prove that the goods in the possession of the defendants which had been purchased from the bankrupt bore the same lot numbers which had been placed thereon by the manufacturers. The following colloquy between the court and counsel occurring while witness Walter F. Stern was on the stand, would tend to explain the nature and effect of the ruling we are now considering:

The witness had prepared a list of articles found in the possession of the defendants which were admittedly purchased from the bankrupt. The list contained the prices of the goods agreed to be paid by the bankrupt and also the price at which the bankrupt sold the same goods to the defendants. In response to questions of the court in connection with his list the witness stated that while he was examining the goods, "Mr. Anches [one of the defendants] would point out certain merchandise to me that would substantiate the invoice number for the merchandise that he had received from Mr. Gold. * * * When Mr. Anches pointed out these men's shoes they showed that they were on invoice 2474 which was the bill that he received from Mr. Gold."

This list was offered in evidence and the following colloquy between court and counsel occurred:

"Mr. Tobin: If Your Honor please, this is the price that was paid by the defendants to the bankrupt, taken off of the defendants' own invoices from the bankrupt himself. They are the prices given him by the defendants as what they paid Gold for the merchandise. It is not a question of qualification.

"The Court: It is agreed in the pleadings that they and Gold had a number of transactions, commencing in April and ending at the end of June. It is stated in the pleadings and admitted by the answer that Gold received some twenty odd thousand dollars in cash for those goods. Now what is the purpose of encumbering this record?

"Mr. Tobin: The purpose of offering this evidence, if Your Honor please, is to show that that merchandise was sold to the defendants here at a discount averaging 31.94 per cent. This is the first step in ascertaining—

"The Court: (Interrupting) On the first page of this exhibit, '40', we find 24 lot numbers.

"The Witness: There are a lot of them under the same number, if I might show it to you. You see, this is 2503, this is 2503, and this, and—

"Mr. Eggerman: (Interrupting) I think I will object to this volunteered testimony in this case by the witness.

"The Court: Objection sustained. Conversations had between the witness and the defendants, or either of them, or their agents, will be admitted, but these exhibits cover many things beyond that point occurring in the absence of the defendants, or either of them. You cannot prove any fact by producing a statement made by another party and having the witness testify to that. Now, if he knows the value of these articles and knows that a certain amount was given for them in Los Angeles when the sale was made, you may go into that. In this case we are dealing with the value of the article on the day on which it was sold by Gold to Anches and not some later date.

"Mr. Tobin: This has reference to what was actually paid for these goods.

"The Court: Let us get down to the trial of this case. I am tired of listening to talk. Obey the rules of evidence and we will get on with this case. If you do not, your case will close, and it will close shortly.

"Mr. Tobin: I would like to take this up in the absence of the jury.

"The Court: The jury will be excused but remain within call in the corridor.

(Thereupon the jury was excused, and the following proceedings were had in their absence and outside of their hearing.)

"Mr. Tobin: If Your Honor please, plaintiff's Exhibit '40' was made contemporaneously, the witness has testified, with the appraisement of the merchandise right there in the store.

"The Court: Now, I understand that, but show me what value it has in the case. I have already ruled that he is not qualified as an expert on prices. What right had he to fix the prices on the merchandise?

"Mr. Tobin: He testified that he took the prices from the invoices received by Gold.

"The Court: How does he know that?

"Mr. Tobin: Because they have the invoices.

"The Court: Well, produce the invoices and make your calculations from them: It appears to be the desire of some counsel to befog the court. Now, in this case you have an open road. You have the invoices or copies of them. You spent all day yesterday playing with those. Now you are trying to make a tabulation from the invoices, and that proves nothing.

"The question here is not what the invoice price was, because that is all agreed upon in the pleadings here. You allege

that the defendants paid to Gold for the goods they bought, some twenty transactions, a specific sum of money. The defendants admit that.

"Mr. Tobin: Yes.

"The Court: Then why play with prices?

"Mr. Tobin: Because there are some twenty some lots, and they contain numerous items. Now, here were shoes, for example—certain lot numbers of shoes that cost 75 cents a pair and were sold to Anches, identified by those lot numbers, for 45 cents a pair, and sold to him at that price within a day or two after they came into Gold's place of business.

"The Court: You cannot show it by this witness. He says that there were thousands of boxes, and he examined approximately 75. How does he know what those boxes contained?

"Mr. Tobin: But, if Your Honor please—

"The Court: (Interrupting) The lot number on the box means nothing, because it was shown by the deposition of Gold that the lot number on the box did not designate truly the contents of it; that Gold went all around the wholesale and retail district of Los Angeles and gathered up boxes bearing the mark of Clapp Brothers, or Murphy, or other recognized shoe dealers; that he put this stuff that he bought in job lots in the East in those boxes and sold it to Anches, and he testified directly that the boxes came from Clapp and Murphy but the shoes were never in their establishments. He testified directly that the lot number as given did not truly represent the shoe that was sold to Anches. How are you going to overcome it by this man saying that the box had a number on it?

"Mr. Tobin: But Mr. Anches gave him the lot number as being the lot number of the merchandise that he purchased. That is something for the jury to determine as to who is telling the truth, Gold or Anches.

"The Court: Mr. Anches testified that he could not read the boxes or the lot numbers. That is Anches' testimony, and he stated that his eye-sight is so bad that he could not read the boxes or the lot numbers as they appeared on the boxes.

"Mr. Tobin: I can show by the testimony of Anches—

"The Court: (Interrupting) Maybe you can show it by somebody else, but you have produced Anches and he has testified as to his eye-sight, and this man on the stand, Stern, has testified that he knew from his contact with Anches that Anches' sight was poor.

"The point I am making is this, that your entire contention is based upon a false premise. You say that these goods were sold by Gold to Anches at a 35 to 40 per cent price below the market. Now, that does not mean in this market, and it does not mean the market in Seattle on that day. It means the market in Los Angeles on the day that it was sold by Gold to Anches. That is the point in this case. You are confined to your pleadings, and those are the pleadings.

"Mr. Tobin: If I am not mistaken, if Your Honor please, my pleadings are that he sold them at 35 or 40 per cent below what he had agreed to pay the manufacturers, the wholesalers or the jobbers.

"The Court: Well, that is all right. A man may sell an article for less than he paid for it, and the reason for doing so may be reasonable. From the testimony that you have offered it appears that a great part of the merchandise was of the vintage of the Gay Nineties, and a great part of it was from the time that Rip Van Winkle went to sleep. Gold testified that the trousers were of a type that you had to use a shoe horn to get into them.

"Mr. Tobin: I realize that. The court can judge from the record what a time we had with Gold when we were taking his deposition.

"The Court: And I can realize what a time he had with you from the record.

"Mr. Tobin: The prices given here are 30 per cent below the prices at which the manufacturers sold to him.

"The Court: That is merely fixed by the lot number, and the testimony so far shows that the lot numbers and the contents of the boxes do not correspond, so it does not prove, as I view it, the value of the article that was sold by Gold. There appears to be a transfer of goods from one box to another box. Goods in one box were put in another, and goods that were unboxed were put in boxes that were secured apparently from a certain wholesale and retail district in Los Angeles. But there is a better way to fix the value of these articles. You have a right to show by a competent witness or by written proof, which Anches knew, what Gold agreed to pay for these articles. That is one way

of determining the reasonable value of the articles on the market. Then you have a right to show by competent witnesses what the going price of the article was at the time and place of the transaction between Gold and Anches, but the way you are trying to do it is not the way to do it.

"Mr. Tobin: The only way that merchandise can be checked back is by the lot number on the box.

"Mr. Eggerman: That is counsel's misfortune then.

"The Court: There is no evidence on that point, and we cannot deal with your opinion or mine. Gold has definitely said that the lot numbers and the contents of the boxes in those particular instances did not correspond. In other words, as I view it, he stated that he definitely set out to cheat Anches, and succeeded in doing so. He produces a lot number on a box. He compares with Anches the lot number on the box with the invoice as sent to him from the factory. Anches thought that he was getting the article that was sent out in that document, but in truth, if we believe Gold, Anches was getting something else that Gold substituted therefor. Gold did not give him what he bought. It appears that the two jobbers were gyping each other. You cannot prove price by an invoice. So produce some man who is qualified to fix values. As I say the invoices or any proof as to what Gold agreed to pay the factory or the seller of these articles would be competent as an element in determining that.

"Mr. Tobin: Well, that is what we are trying to do, if Your Honor please, to go back and establish the connection between that and the incoming invoices. For instance, the Jackson shoes, 914 pairs of shoes went into Mr. Gold's place of business one day, and 914 pairs of shoes billed out of Gold's place of business the next day. And then we have 914 pairs of shoes in Anches' place of business with the Jackson lot numbers and the lot numbers corresponding with those on the shoes that went out from Gold.

"The Court: An astute attorney such as you should have followed this thing through and looked into those thousands of boxes and found out what was in them.

"Mr. Tobin: I was not here at the time.

"The Court: Instead of sending the professional referee in bankruptcy or his clerks to make the examination, and examine 75 out of thousands of boxes. Stern said that there were several thousand boxes. Now strike an average on that. How far can it prove your contention? Counsel in his questions said many, many thousands, and the witness Stern said several thousand. Finally Stern said that it was about 75 that he looked into. He finally said that that was the number that he saw. You have got to prove that the articles sold by Gold to Anches are the articles that appear in the invoices.

"Mr. Tobin: I would like to make an offer of proof.

"The Court: Well, you prepare the order [offer] of proof and present it at two o'clock. I spent until one o'clock this morning looking up the authorities you gave me, and none of them supports your contention, and I have waived my noon hour recesses doing the same thing. Get your case ready for presentation to the Court and jury and let us quit playing around in this case. I have told you definitely what you would be required to do. You are definitely required to prove, if you go into price and use the invoices, that the article that was sold by Gold to Anches was the article referred to in the invoice; and you have got to show that not by lot numbers but by someone who has personal knowledge of the facts.

"Finally you will be required in support of your theory of the case to show the price on the market in Los Angeles of these specific articles, or articles of similar kind and character, on the day that the defendant Anches bought them from Gold.

"You cannot go beyond your pleadings, and that is the crux of your entire action, the purchase price, and the price on the market of the articles that Gold sold to Anches. If you will read your pleadings you will find that that is true.

"Mr. Tobin: I am thoroughly familiar with my pleadings.

"The Court: Is there any other point in the case excepting your contention that Gold sold for $23,000 cash what it cost him $35,000 on the market some months before?

"Mr. Tobin: My theory of the case is simply this, if Your Honor please. We have some twenty invoices to N. Anches & Son covering merchandise that totals $23,000 ranging from—well, the Court heard me read the amounts the other day in connection with these invoices. There:

has been in the possession of counsel for the defendants—I believe I made an offer of an envelope of invoices of Sam Gold. Counsel wanted to look them over, and I believe their admission in evidence has been held up until counsel has had an opportunity to look them over. There are a large number of invoices from manufacturers, wholesalers and jobbers throughout the entire United States who sold shoes, blankets and other merchandise to Sam Gold at a certain definite price, which bear the receiving stamp, indicating that that merchandise was received at Sam Gold's place of business on a certain date; that coinciding very closely with the dates of the receipt of that kind of merchandise in the place of business of Gold, coinciding sometimes within a day, or sometimes the same day, or three or four days, merchandise bearing the very same lot numbers of the merchandise that came in, or boxes with merchandise in them with the very same lot numbers that were on the invoices went out and were found in Anches' place of business; were checked; and the price that Anches agreed to pay Gold was substantially or was on an average 31.94 per cent below the cost to Gold exclusive of freight.

"The Court: 'That as a result of said conference there was transferred by the said Sam Gold, between the 30th day of April, 1937, and the 30th day of June, 1937, and within four months preceding the filing of the involuntary petition in bankruptcy against the said Sam Gold, to the said defendant, N. Anches & Son, merchandise of the charged price to the said Sam Gold of $34,102.47, for a total selling price to the said defendant of $23,208.47, which said transfers will be hereinafter more specifically described, and which said transfers, and each of them, were made by the said Sam Gold to said defendant with the intent and purpose on his part to hinder, delay or defraud his creditors, and which said transfers were not taken by the defendant copartnership in good faith and for a present fair consideration.'

"Now, that is the crux of the whole case. That is your contention, that they paid in cash twenty-three thousand and some hundred dollars for goods that were charged to Gold for $34,000; and you cannot prove the value of those goods by proving the lot numbers because your own testimony shows that the goods in the boxes had been changed. The lot number remained on the boxes, but the contents of the boxes had been altered. I take it that the Jackson shoe is a fairly good shoe.

"Mr. Tobin: A 75 cent working shoe.

"The Court: But according to Gold the shoes that he sold to the defendants here were shoes with paper soles—the cheapest thing that could be gotten on the market anywhere, and I do not see how you are going to fix your sale price to Gold unless you produce the invoices as delivered to Anches.

"Mr. Tobin: We have the invoices—

"The Court: Well, I do not see how you are going to prove that these same shoes were sold to Anches in the absence of a witness who knows that to be the fact.

"Mr. Tobin: If Your Honor please, Gold—

"The Court: (Interrupting) Gold says that that is not true, and he is your witness.

"Mr. Tobin: His interests are adverse to that of the trustee.

"The Court: That may be, but you produced him as a witness. He is your witness, and he says that it is not true. But the burden is on you to prove that it is true, that he sold articles for which they paid $23,000 whereas they were worth $34,000.

"Mr. Tobin: The evidence has got to be circumstantial.

"The Court: It does not have to be circumstantial. The contents of those boxes that appeared on the shelves of Anches were obvious to anybody who made an honest inquiry. Your agents did not go there and examine the contents of those boxes. You took a lot number as it appeared on the boxes and said that the value was so and so, but as far as he knows and as far as his testimony shows—this is Stern—every box but seventy-five was not examined.

"Mr. Tobin: But the defendant told him that those lot numbers were correct. Anches told him that.

"The Court: Yes, but he did not tell him that the contents had been altered. The lot numbers were on the boxes.

"Mr. Tobin: Well, that was something that the defendant had a perfect right to tell him if he wanted to. But the defendant misled him and deceived him by saying 'Here are the Jackson shoes and there are the lot numbers.'

"The Court: He did not say so. He in effect said, 'Here, go and examine for yourself. These are the lot numbers that I got from Gold.'

"Mr. Tobin: Pardon me, but—

"The Court: (Interrupting) That is what Anches said to your witness. And he said, 'Go in there and make your own check.' And your witness instead of going in and making the check took the lot number on the box, compared it with the invoice that Anches had received from Gold, and out of many thousands of boxes he only looked at seventy-five.

"Mr. Tobin: Well, that would be a matter of weight rather than of admissibility.

"The Court: The witness Stern is not qualified to give us the contents of any of those boxes. He has not testified that there was a Jackson shoe in any boxes that he examined. He has not testified what the contents of the 75 boxes may have been.

"You are called upon to prove that the goods that Gold paid $34,000 for were sold by him to Anches for $23,000. That is the revolving point of your entire case. That is the theory that you have adopted in your pleadings, and that is the theory that you have to support by the proof. So try to get your evidence together on the theory of your pleadings. If my theory is not correct, inform me of my error. But you will have to prove by some one the value of these articles on the market at the time that there were dealings between Gold and Anches.

"Many a man has bought what he thought was gold, but he found out that it was fool's gold, and that is just too bad for him. He went in the market and bought stocks which he thought were worth hundreds of dollars and found out that they were not worth one cent on the dollar, and it is just his hard luck.

"The question is the value on the market at the time of the transactions between Gold and Anches.

"And get your offers of proof because I am going to confine you to them. I am going to confine you to your pleadings; to the cost price of these articles appearing on the inventories which you say were actually sold and delivered to Anches, and that they were sold and delivered to him at a less price than Gold paid for them."

It will be observed that during this colloquy the court called attention to the fact that the bankrupt called as a witness by the appellant had given testimony adverse to the contention of the appellant and that having called this witness the appellant was bound by his testimony. In short, the court held that the bankrupt having testified that his intent in selling the goods to appellee was to defraud appellee and not to defraud his creditors, the appellant was bound by his testimony. This is not the rule.

The case was tried in the state of Washington and the Supreme Court of Washington has stated the rule as follows: Schuster v. Sutherland, 92 Wash. 135, 142, 158 P. 730, 733.

"But no rule prevents a party from presenting all the competent testimony he has relating to a particular fact. If his witnesses disagree, it is so much the worse for him, as he alone is the sufferer, but the evidence is not inadmissible because contradictory of that of a previous witness. If the rule were otherwise, a party would always be at the mercy of his first witness." See also Ferguson v. Standley, 89 Mont. 489, 300 P. 245.

The appellant was attempting to prove by circumstantial evidence that the goods purchased by the appellees from Gold were the same goods that Gold had purchased for about 50 per cent more than the appellees had paid him for the goods. It would be more persuasive evidence of fraud if it were shown, as alleged, that the identical goods purchased by Gold were immediately resold in the original packages for two-thirds their cost; but if goods of a certain type and character were being purchased at the higher price and similar goods were immediately sold by the bankrupt for the lower price the evidence of fraud is not much less weighty. That is particularly true in the case at bar. The descriptions of the goods purchased by the appellees from the bankrupt cover 20 pages of the transcript. The several items consist of dozens of articles, such as 45-½ dozen silk hose; 50 dozen canvas gloves; 100 dozen handkerchiefs; 60 dozen Snuze pillow cases, etc. Taking into consideration the volume of the bankrupt's business and the character of the purchases and sales, the similarity of so many items purchased by and sold by him within so limited a time, would on the theory of permutations and combinations amount almost to a demonstration that the goods sold by the bankrupt were the iden-

tical goods so recently purchased by him. The manufacturers' and wholesalers' invoices to the bankrupt indicate the prices the bankrupt promised to pay for the goods. These were ruled out.

It should be borne in mind in considering a question of error in rejection of the evidence sought to be elicited by the question under consideration, that it is not necessary for the appellant to show that every one of the boxes or articles therein was the identical article purchased by the bankrupt at a higher price. If he could show that a single pair of sox had been purchased and at once sold at a 30 per cent less price it would have been competent evidence to present to the jury. So, if the witness was prepared to testify that he had examined 75 boxes out of hundreds, and that the goods contained therein were the same goods purchased by Gold, or similar goods in quality and quantity, such evidence would be admissible. A litigant is entitled to prove any part of his case he has alleged, if he is able to do so. For this reason the appellant is entitled to show that some or all of the goods in the hands of the defendant were still marked by the lot number placed thereon by the seller to the bankrupt.

The ruling on point 13 was erroneous. The question was neither vague nor indefinite, nor, as the court held, did it merely call for his interpretation or conclusion for it was a preliminary question. Ordinarily the rejection of such a question would not be reversible error because the difficulty could be quickly repaired by reframing the question or by asking for the conversation itself. This the appellant did, but these questions were in turn rejected, as above stated. This ruling was based upon a misconception of the law concerning the effect of the testimony of an adverse witness called by the appellant. This ruling permeates the entire case, as was evidenced by the statement made to the jury by the court at the time they were instructed to return the verdict for the defendants.

Two other points relied upon by appellant will be briefly mentioned. Under point 25 in his brief appellant contends that the court erred in sustaining appellees' objection to the introduction in evidence of the transcript of the testimony of appellee N. Anches, taken under § 21, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 44, sub. a. The trial court ruled the evidence out upon the ground that it was in the nature of a deposition and if the witness could be produced in court at the trial, the testimony offered could not be used. This was error. Even if we assume that the proceeding under which the testimony was taken was in the nature of a deposition it was clearly admissible as an admission of a party against interest. As such, it was immaterial whether or not the witness was able to testify or had testified in the action in which he was a party. Kneezle v. Scott County Milling Co., Mo.App., 113 S.W.2d 817; Cote v. Sears, Roebuck Co., 86 N.H. 238, 166 A. 279; Reilly v. Buster, Tex.Civ. App., 52 S.W.2d 521; Newby v. Gibson, 6 Cal.App.2d 359, 44 P.2d 468. See 22 C.J. 342, § 387; Slattery v. Dillon, 9 Cir., 17 F.2d 347. Another ground relied upon by the trial court in excluding that evidence was that the transcript consisted of a bound book containing the testimony of other witnesses which, under Washington statutory law (section 308—5, Remington's Revised Statutes of Washington) might be taken by the jury to the jury room. All that was offered in evidence was the testimony of N. Anches which counsel offered to read. This was the proper way to adduce the evidence. The evidence consisted of statements of the witness concerning the circumstances under which he made his purchases from the bankrupt. It tended to show that the purchases were not made in good faith and thus was pertinent to the issues in the case.

In his point 12 appellant contends that the court erred in sustaining appellees' objection to the admission into evidence of a number of invoices from various wholesalers, agents and manufacturers. The invoices were found in the bankrupt's place of business. They were received in the ordinary course of business and many of them were stamped as showing that the goods invoiced had been "received," in the ordinary course of business. They were admissible. See 28 U.S. C.A. § 695. The court excluded them because of certain notations upon them. But the court refused to permit the witness to explain what these notations were. From examination of the invoices, the notations apparently consisted of numbers such as "2503" in the corners of the invoices having no relation to the contents of the invoices but placed there by the witness to assist him in his preparation of a compilation from the invoices. If this

was the case, there was no reason to reject the invoices as evidence. The witness should have been allowed to explain what the notations consisted of.

As the case is to be reversed and returned for a new trial, it would not be inappropriate to pass upon some of the other rulings complained of, but, as we have indicated, the points are not properly raised and they may not again arise on a new trial.

Reversed and remanded for new trial.

HANEY, Circuit Judge (dissenting).

I think it unnecessary to discuss the rules of this court cited by the majority for notwithstanding the alleged violation thereof found in the majority opinion, such opinion is reached by a consideration and determination of the merits.

Appellant alleged that certain sales of merchandise, enumeration and content thereof being admitted by answer of appellees, were made by the bankrupt with the intent on his part to defraud his creditors. Appellant sought to show the intent by proving a shrinkage of assets while liabilities were increasing. He asserts that such proof is evidence of the fraudulent intent, and relies on cases wherein such evidence is held admissible in criminal cases charging concealment of assets by a bankrupt. The majority apparently assumes the rule to be applicable here although the contention is not mentioned. I express no opinion in that regard, but will assume for the purposes of this dissent that the rule relied on is applicable here.

Appellant's argument is that proof of a shrinkage of assets, with increase of liabilities, is sufficient to support an inference of the intent to defraud on the part of the bankrupt. To prove the shrinkage, appellant introduced the books of the bankrupt which disclosed the inventory of the bankrupt on January 1, 1937. It was necessary, under appellant's theory, to prove the inventory of the bankrupt on July 9, 1937. One Stern had taken an inventory of the stock in bankrupt's place of business on the latter date, and appellant offered such inventory in evidence. The inventory was properly excluded for several reasons, unnecessary here to state because the majority neither holds nor contends to the contrary. The shrinkage was not attempted to be shown in any manner except by use of such inventory. With its exclusion went all proof of one element in the case—the bankrupt's intent to defraud—and, as appellant concedes, the "entire case necessarily collapsed".

With that situation in mind, a different light is thrown on the alleged errors which the majority hold to be reversible. As to the first error (appellant's point 13), mentioned by the majority, the questions were designed to lay a foundation for the introduction of certain inventories taken by Stern at appellees' place of business in Seattle. These inventories merely showed what merchandise purchased from bankrupt, appellees then had, a point wholly immaterial to the case because appellees admitted by their answer to the purchase of the goods specified in the bill of particulars at the prices therein stated. Surely it is not error to exclude evidence of facts already admitted. The authorities so hold. Dempster v. Cochran, 3 Cir., 174 F. 587; Spring Garden Ins. Co. v. Wood, 4 Cir. 233 F. 223, certiorari denied 242 U.S. 631, 37 S.Ct. 15, 61 L.Ed. 537; Mitchell v. Pittsburgh, C., C. & St. L. R. Co., 6 Cir., 13 F.2d 704; German Ins. Co. v. Frederick, 8 Cir., 58 F. 144.

With respect to the exclusion of the transcript of testimony of appellee N. Anches (appellant's point 25), the purpose of such evidence was to show knowledge on the part of appellees of the bankrupt's scheme to defraud. The invoices excluded (appellant's point 12), were offered as proof in part of the theory alleged to show shrinkage by disclosing the purchases after January 1, 1937. As stated, however, no shrinkage was or could be shown, because the inventory taken on July 9, 1937, was not admissible. Thus, even if the evidence mentioned had been admitted, the result would not and could not have been changed, because in the absence of proof of shrinkage, there was no proof of intent to defraud. The exclusion of evidence which could not change the result of the case is not reversible error. Teese et al. v. Huntingdon et al., 64 U.S. 2, 23 How. 2, 8, 16 L.Ed. 479; Reavis v. Fianza, 215 U.S. 16, 25, 30 S.Ct. 1, 54 L.Ed. 72, Sac and Fox Indians of the Mississippi, 220 U.S. 481, 489, 31 S.Ct. 473, 55 L.Ed. 552; Edwards v. Robinson, 9 Cir., 8 F.2d 726, 727; Corrigan v. United States, 9 Cir., 82 F.2d 106, 109.

For the foregoing reasons I think the judgment should be affirmed.