WhitakeR, Judge,
delivered the opinion of the court:
This case was formerly before this court on plaintiff’s original and amended petitions. Judgment was entered in favor of the plaintiff for $1,317,087.27 (82 Ct. Cls. 135). We were reversed in part by the Supreme Court (299 U. S. 417) principally on the ground that the judgment embraced items set up for the first time in an amended petition which was filed after the expiration of the statutory period within which suit could be brought. Upon remand of the case here, judgment was entered in favor of the plaintiff for $10,099.25.
Following this, on August 16, 1937, Congress passed the act set out in finding 2 giving plaintiff the right to amend its petition to conform to the evidence taken and conferring jurisdiction on this court to render judgment on the items set up for the first time in such amended petition. In pursuance thereto a second amended petition was filed on November 8,1937.

Claims asserted in paragraph III of plaintiff’s second amended petition (Findings 3 and If)

In this paragraph plaintiff asserts a claim under a portion of article VIII of the treaty of August 7,1856 (11 Stat. 699, 702), and under a portion of article IX of said treaty. The total amount of the claim asserted is $63,353.42. The amount of $61,563.42 thereof arises under that provision of article VIII of the treaty of 1856 which reads as follows:
* * * the United States do therefore agree and stipulate as follows, viz: * * * to provide annually for *516 ten years the sum of three thousand dollars for the support of schools; two thousand dollars for agricultural assistance; and two thousand two hundred dollars for the support of smiths and smith shops among them.
The balance of $1,790 arises under that portion of article IX of the treaty set -out in finding 4, under which the defendant agreed to spend the sum of $20,000 in improvements after all the Florida Seminóles had removed to the “Seminole country west.”
As set out in finding 3, the defendant has spent only $10,436.58 of the total of $72,000 due under said part of article VIII, leaving a balance due the plaintiff of $61,563.42. Of the $20,000 agreed to be spent for improvements, the defendant expended the total amount of $18,210, leaving a balance of $1,790, or a total due on the claim asserted in paragraph III of the petition of $63,353.42. Judgment for this amount was rendered on the former trial, but the Supreme Court reversed as to both of these items (299 U. S. 424, 425) because they had been included for the first time in the amended petition filed after the expiration of the statute of limitations.
The amount of $63,353.42 has not been expended by the defendant for the purposes set forth in the two above articles of the treaty. However, the act of July 5,1862 (12 Stat. 512, 528), authorized the President to expend Seminole funds “for the relief and support of such individual members of said tribes” (the Seminóles among the number) “as have been driven from their homes and reduced to want on account of their friendship to the government.” A total of $249,731.88 thereof has been spent for the relief of refugee Indians. Of this amount $31,599.68 was spent for the benefit of refugee Seminole Indians (pp. 28, 29, Gr. A. O. report, filed September 6,1934). The expenditure of so much thereof was authorized by said act. It may be doubted that power resided in the Congress to authorize the expenditure of Seminole funds for the benefit of Indians of other tribes, but article VIII of the treaty of March 21, 1866 (14 Stat. 755, 759), provides:
The stipulations of this treaty are to be a full settlement of all claims of said Seminole nation for * * * all. expenditures, by the United States of annuities in clothing and feeding refugee and destitute Indians *517 since tlie diversion of annuities for that purpose, consequent upon the late war with the so-called Confederate States. And the Seminóles hereby ratify and confirm all such diversions of annuities heretofore made from the funds of the Seminole nation by the United States.
It will be noted that the ratification of the expenditures for this purpose relates not only to expenditures for destitute Seminole Indians, but to destitute Indians in general. Irrespective, therefore, of whether or not the expenditures were authorized when made, they were ratified by this treaty. This treaty further provided that the amounts to be paid under it were in full settlement for the expenditures from their funds for destitute Indians.
In our former opinion in this case we held that the ratification by the treaty of 1866 related to expenditures of annuity funds only. We reaffirm this holding, but we are of the opinion that the amounts stipulated for in the quoted portion of article VIII of the treaty of 1856 were annuities; that is to say, annual payments. We do not think that the word “annuities” is to be restricted to annual payments for per capita distribution to the tribe, but embraces all annual payments.
The amount expended for the relief of destitute Indians being in excess of the defendant’s obligation under the quoted provision of article VIII of the treaty of 1856, it results that the plaintiff is not entitled to recover on this item.
As to the item of $1,790: The defendant obligated itself to expend the $20,000 in improvements only “after they shall all remove” from Florida to the country west. The proof shows that of the 500 Seminóles in Florida, but 164 of them removed to the country west. Although the condition of the obligation was never met, the defendant spent $18,210 of the total of $20,000. This we think more than discharged its obligation, legal or moral, under this article of the treaty, and that, therefore, the plaintiff is not entitled to recover the item of $1,790. (Amended.)[1]
*518 It results that the plaintiff is not entitled to recover any amount on account of the claim set forth in paragraph III of plaintiff’s second amended petition.

Claim, asserted in paragraph IV of plaintiff's second amended petition (Finding 5)

In this paragraph plaintiff asserts a claim under another portion of article VIII of the treaty of August 7, 1856 (11 Stat. 699, 702) which is set out in finding 5, and which, in substance, provides for the payment to the Seminóles per capita of interest at 5 per cent on $500,000. The plaintiff alleges that the defendant has either illegally disbursed or failed to disburse $154,551.28 of the amount due under this portion of this article of the treaty.
On the former trial of this case the court entered judgment on this item for $154,551.28. The Supreme Court reversed on two grounds: first, because a part of the amount claimed was due for a period not within that covered by the original petition; and, second, because the findings did not show that any portion of the fund had been illegally disbursed. Since the original petition was not grounded upon the failure to disburse, but only upon illegal disbursements, the Supreme Court held that there could be no recovery under the findings. The second amended petition, on the other hand, prays recovery both for illegal disbursements and for a failure to disburse.
In finding 5 there is set forth a statement of the years in which there was a deficit or an overpayment of the amount of this interest. It appears that the excess of the deficits over the overpayments is $92,423.74.
The table shows deficits for the years 1870-1874, both inclusive. In each of these years, however, payments were made out of this fund for purposes other than those specified in article VIII of the treaty in the amounts set out in the finding. These payments were made pursuant to resolutions of the Seminole General Council. The defendant claims credit for these amounts totalling $66,422.64.
Article VIII of the treaty of 1856 provided that these payments should be made per capita for the benefit of each *519 individual Indian, but whether or not it was an agreement for the benefit of each individual Indian, it was an agreement between the United States and the tribe and not the individuals. The Sac and Fox Indians, 220 U. S. 481. So that we are presented with a case where one of the contracting parties says to the other, I wish you would pay me this money so I can use it for another purpose I have in mind; if you will do so, I agree to relieve you of your obligation to make the per capita payments. If the other contracting party agrees and pays the money as requested, certainly the other party cannot later hold him liable for doing so.
In the year 1907, $12,500 was paid to the United States Indian Agent. This payment was authorized by section 11 of the act of April 26, 1906 (84 Stat. 137, 141), which provides, in part:
That all revenues of whatever character accruing to the Choctaw, Chickasaw, Cherokee, Creek, and Seminole tribes, whether before or after dissolution o'f the tribal governments, shall, after the approval hereof, be collected by an officer appointed by the Secretary of the Interior under rules and regulations to be prescribed by him; * * *.
The $92,423.74 must be credited, therefore, with the sum of $78,922.64, leaving a balance due plaintiff under this portion of article VIII of the treaty of $13,501.10.

Olaim asserted in paragraph V of plaintiff's second amended petition (Finding 6)

In this paragraph plaintiff asserts a claim for $90,597.20 under that portion of article III of the treaty of March 21, 1866, (14 Stat. 755) in which the defendant agreed to pay annually 5 per cent interest on $50,000, or $2,500, for “the support of schools.” In plaintiff’s requested finding 8 the amount of this claim is reduced to $61,347.20. In our former opinion (82 Ct. Cls. 135, 151-152) we held that payments made to the tribal treasury during the years 1875-1879, both inclusive, were unauthorized, and we gave judgment therefor in the amount of $57,500, and also for underpayments for the years 1867-1874, both inclusive, amounting to *520 $3,097.20, and for an underpayment of $750 for the year 1907, amounting in all to the sum of $61,347.20. The Supreme Court reversed because the claims asserted were not within the statutory period, and because the original petition, as amended, was grounded only on a misapplication of the funds, and not on a mere failure to pay.
Even though the payments to the tribal treasurer during the years 1875-1879 may have been unauthorized, it appears that the tribal treasurer disbursed annually not less than $2,500 in excess of amounts it was otherwise obligated to expend for the maintenance of its schools.[1] Since the schools actually got the money, it makes no difference that the payments were made through the agency of the tribal officials. The defendant would be liable, if at all, only if it appeared that the payments were not in fact made.
The $750.00, which it is alleged was not paid for the year 1907, was paid to the Indian Agent under the authority of section 11 of the act of April 26, 1906 (34 Stat. 137), heretofore quoted.
However, the plaintiff is entitled to recover the underpayments during the fiscal years 1867-1874, both inclusive, in the amount of $3,097.20.

Claim, asserted under paragraph VI of plaintiff’s second amended petition (Finding 7)

In this paragraph plaintiff asserts a claim for $10,000 under the provisions of article VI of the treaty of March 21, 1866 (14 Stat. 755), under the terms of which the United States agreed that it would erect an agency building on the Seminole reservation “at an expense not exceeding ' ten thousand ($10,000) dollars.”
In the original opinion in this case it was held that the plaintiff was entitled to recover $9,068.24, being the balance of $10,000 after the deduction of $931.76 shown to have been spent for “agency buildings and repairs.” The Sh- *521 preme Court reversed as to this item because not within the period alleged in the original petition. The plaintiff in its present brief admits that it is entitled to recover under this item no more than $9,068.24.
Congress by the act of July 28, 1866 (14 Stat. 319), appropriated the sum of $10,000 for this purpose, but this amount was not used and was returned to surplus. By the act of May 18, 1872 (17 Stat. 132), the sum of $20,000 was appropriated to replace the appropriation of 1886 returned to surplus and for the erection of an agency building pursuant to the Creek treaty. It appears from the report of the General Accounting Office, filed herein on September 6, 1934, pages 20, 25, and 27, that $9,030.15 of the $10,000 appropriated for the Seminole Agency was expended for some purpose, since on July 31, 1875, $969.85 of that part of the appropriation due the Seminóles was returned to surplus; but it does not appear for what purpose it was used. However, it appears from the report of the Commissioner of Indian Affairs for 1873, pages 211 and 212, that an agency building was erected on the Seminole reservation in that year. Whether or not the $9,030.15 was used for this purpose, it nevertheless appears that an agency building was erected and there is no showing by the plaintiff that it was not suitable. Article VI of the treaty of March 21, 1866, provided merely for the erection of “suitable agency buildings” “at an expense not exceeding ten thousand ($10,000) dollars.” [Italics ours.] It appears that agency buildings have been erected and there is no showing that they were not suitable. Therefore, there has been no violation of this article of the treaty.
Claim asserted under -paragraph, VII of plaintiff's second amended petition (Finding 8)
In this paragraph the plaintiff asserts a claim for all moneys paid to its tribal treasurer after the passage of the Curtis Act of June 28.1898 (30 Stat. 495). The total amount of these payments was $864,702.58. Of this amount $212,500 was paid to fulfill the obligation of article VIII of the treaty of 1856 providing for per capita payments of *522 $25,000 per annum; $29,750 of it was to fulfill the obligation of article III of the treaty of 1866 providing for the payment of interest at 5 per cent on $50,000 for school purposes, and 5 per cent interest on $20,000 for the support of the Seminole government; $622,156.87 of it was to fulfill the obligations of section 12 of the act of March 2,1889 (25 Stat. 980, 1004), which provided for the payment of interest at 5 per cent per annum on $1,500,000 “to be paid semiannually to the treasurer of said nation.” The remainder of $295.71 is “proceeds of labor.”
Plaintiff says that the payment of these moneys to the tribal treasurer was prohibited by section 19 of the Curtis Act (30 Stat. 495), which reads as follows:
That no payment of any moneys on any account whatever shall hereafter be made by„the United States to any of the tribal governments or to any officer thereof for disbursement, but payments of all sums to members of said tribes shall be made under direction of the Secretary of the Interior by an officer appointed by him; and per capita payments shall be made direct to each individual in lawful money of the United States, and the same shall not be liable to the payment of any previously contracted obligation. [Italics ours.]
Defendant replies that this section was not intended to apply to any moneys except those required to be distributed per capita among members of the tribe; and, further, that although unlawfully made, the plaintiff is estopped to complain thereof; and, thirdly, that if unlawfully made, the defendant is entitled to a credit for the payments as gratuities.
On the former trial of this case this court held that all the payments to the tribal treasurer were prohibited by section 19 of the Curtis Act, which section we held applied to the Seminole Nation, and that the plaintiff was entitled to judgment for the entire amount. The Supreme Court reversed, first, on the ground that the original petition was based upon the defendant’s alleged refusal to make payments to the tribal treasurer; and, second, that the amended petition, which for the first time complained of the payment of these sums to the tribal treasurer, was filed after the expiration of the statutory period.
*523 We reaffirm our former opinion in this case to the effect that section 19 was intended to apply to the plaintiff. The Secretary of the Interior in making the payments to the tribal treasurer was acting under the authority of an opinion of the Assistant Comptroller of the Treasury. In that opinion the Comptroller held that the Seminole agreement ratified July 1, 1898 (30 Stat. 567), providing as it did for the continuation of existing treaties between the Seminóles and the United States, made section 19 of the Curtis Act inapplicable to the Seminole Nation. He was of the opinion that under these treaties the Secretary of the Interior was authorized to pay funds due the tribe into the tribal treasury; but, as we held in our former opinion, the authority to pay these funds to the tribal treasurer was derived not from a treaty, but from the act of April 15, 1874 (18 Stat. 29), which authorized such a disbursement, provided the Council of the tribe agreed thereto. We do not think that the Seminole agreement providing for the continuation of existing treaties had in contemplation an agreement entered into under this Act. It is hardly conceivable that on June 28, 1898, Congress should have passed an Act prohibiting the making of certain payments to the tribal treasurers of all the Five Civilized Tribes, which included the Seminole Nation, and three days later should have passed an Act repealing this provision as to the Seminóles. We are of opinion that the prohibition of the Curtis Act applied to the Seminóles.
However, on further consideration, we think the prohibition of section 19 of the Curtis Act had application only to per capita payments. In the first clause of that section it is provided—
That no payment of any moneys on any account whatever shall hereafter be made by the United States to any of the tribal governments or to any officer thereof for disbursement; * * *
but the meaning of this clause is modified by the following one, which reads:
* * * but payments of all sums to members of said tribes shall be made under direction of the Secretary of the Interior by an officer appointed by him; * * * [Italics ours.]
*524 The succeeding clause directs how these officers shall make these payments to members of the tribes. It provides:
* * * and per capita payments shall be made direct to each individual in lawful money of the United States, and the same shall not be liable to the payment of any previously contracted obligation.
Except for the second clause of this section, it is perhaps true that the Act would have prohibited the payment to the tribal treasurer of all sums of whatever character and for whatever purpose they were to be used; but the word “but” in the beginning of the second clause connects the second clause to the first and shows that Congress had in mind only the payments due to members of the tribe.
The tribal government in the Seminole Nation was continued after the passage of the Curtis Act, and the former restriction on the enactments of the General Council of the tribe requiring their approval by the President of the United States was removed by the Seminole agreement. The removal of this restriction is inconsistent with a purpose to deprive them of their right to collect moneys due the tribe.
Moreover, as the defendant points out in its brief, the Curtis Act, as originally drawn, directed that not only payments of sums to members of the tribe should be made by an officer appointed by the Secretary of the Interior, but also provided that “payments of all expenses incurred in transacting their business” should be so made. When the Act was finally passed, this clause relating to the payment of expenses incurred in transacting their business was eliminated.
We conclude, therefore, that while section/ 19 of the Curtis Act is applicable to the Seminole Nation, it prohibited the payment to the tribal treasurer of per capita payments only. Choctaw Nation v. United States, 91 C. Cls. 320. These payments amounted to the sum of $212,500.
But although the Curtis Act did prohibit the making of these per capita payments to the tribal treasurer, and they were so made in violation of its terms, still we do not think the tribe is entitled to recover. The passage of the Curtis Act did not create in the individual Indians any vested *525 rights. It does not amount to an agreement with the tribe for the benefit of its individual members. It was merely a direction to the agents of the United States. The Sac and Fox Indians, supra.
It is not disputed that the tribe got the money. It was paid to it in pursuance of a request of its General Council. Plainly, therefore, the Nation cannot maintain an action for the payment of it a second time. It is only the Nation which is authorized to sue by the jurisdictional act.
It results that the plaintiff is not entitled to recover on this item.
defendant’s COUNTERCLAIMS
1. Defendant's claim for an offset as set out in Finding- 9
By the act of July 27, 1868 (15 Stat. 199, 214), Congress appropriated $31,083.79 for subsisting the Seminole Indians, and provided that that amount should be deducted from any funds belonging to them. This amount was expended, but has not been deducted from the funds due them. The plaintiff admits that the defendant is entitled to this offset. We agree.
2. Defendants claim for an amount of lands deeded plaintiff in addition to the tract provided for by the treaty of 1866 (Finding 10)
Under the treaty of 1866 the defendant undertook to provide 200,000 acres of land for the use of the Seminóles. The east boundary of this tract was to be the west boundary of the Creek reservation. The plaintiff, however, was erroneously located partly on the Creek reservation. When this error was discovered the defendant purchased from the Creek nation 175,000 acres of its lands located east of and adjoining the Seminole reservation, for a consideration of $175,000. The eastern boundary of this tract, however, was run so as to include not 175,000 acres, but 177,397.71 acres.
When the west boundary was located it developed that the total number of acres in the reservation, exclusive of the 177.397.71 acres above referred to, was 188,449.46 acres, or 11,550.54 less than the 200,000 acres which the defendant was *526 obligated to furnish, under the treaty of 1866. The defendant claims an offset of the difference between the 177,897.71 acres and the 11,550.54 acres at $1.00 per acre.
The defendant was obligated by treaty to purchase only 200,000 acres of land and therefore under the act of August 12, 1935 (49 Stat. 571, 596) it is entitled to an offset for the additional acreage purchased. This was 165,847.17 acres, the purchase price of which was $165,847.17. The defendant is entitled to a,n offset of this amount under the above-mentioned act, section 2 of which directs this court—
* * * to consider and to offset against any amount found due the said tribe or band all sums expended gratuitously by the United States foi the benefit of the said tribe or band.
3. Defendant's claim of gratuity payments as set out in Finding 11
The defendant claims that from 1857 to 1866, both inclusive, it expended gratuitously for the benefit of the Seminole Nation the sum of $42,861.54 for various purposes, as set out in Finding 11.
In defense the plaintiff insists, first, that the Act of August 12, 1935, has application only to cases that had not been tried or submitted, and that this case had been tried or submitted prior to the passage of that Act. We think there is no merit in this contention. It had been tried and submitted in this court, but the Supreme Court reversed principally because many of the claims were first asserted after the expiration of the statutory period within which suit could be brought. After an amendatory act was passed enlarging the period of limitations, a second amended petition was filed setting up these claims. It seems manifest that as to all issues not finally disposed of at the former trial this is not a case that had been tried or submitted.
Secondly, the plaintiff says that many of the expenditures set out in finding 11 were required by treaty. If this be true, of course the defendant is not entitled to the offset.
The first item is for agency buildings and repairs, $5,200. The plaintiff says these expenditures were required by *527 article XII of the treaty of August 7, 1856 (11 Stat. 699), which provides, in part:
So soon as the Seminóles west shall have moved to the new country herein provided for them, the United States will then select a. site and erect the necessary buildings for an agency, including a Council house for the Seminóles.
The defendant replies that this obligation was discharged by the expenditure of $720 for a Coúncil house and $4,950 for erecting agency buildings. Both of these amounts and the $5,200 claimed as a gratuity were spent under appropriation acts appropriating money for agency buildings and repairs, both of which were passed shortly subsequent to the treaty of 1856, one on February 28, 1859, and the other on June 19, 1860. The obligation of the treaty was to erect “necessary” agency buildings. It seems clear that the total amount spent was spent to fulfill the obligations of the treaty and that the defendant is not entitled to this offset.
The next item is “clothing, $610.00.” This amount was expended in the year 1866 pursuant to the Appropriation Act of March 3, 1865 (13 Stat. 541). Under article IX of the treaty of 1856 the defendant obligated itself to remove the Florida Seminóles to the west, and to furnish them with certain specified articles of clothing. The report of the Commissioner of Indian Affairs of 1858 shows that the Florida Seminóles went to the west in 1858. On March 3, 1857, Congress appropriated the sum of $120,000 to fulfill the obligations of this article of the treaty. The report of the General Accounting Office filed September 9,1934, shows that the sum of $88,697.05 was disbursed for this purpose. This presumably discharged this obligation of the treaty and the disbursement of $610 in 1866, eight years after the migration, must have been a gratuity. The defendant is, therefore, entitled to this offset.
The next item is “Education, $2,500.00.” This offset the plaintiff concedes the defendant is entitled to. We agree.
The next item is “Expenses of delegates, $5,155.70.” This amount was spent in the year 1857. The plaintiff says this *528 was spent pursuant to article XXIII of the treaty of 1856 (11 Stat. 705), which provides:
A liberal allowance shall be made to each of the delegations signing this convention * * * as a compensation for their travelling and other expenses in coming to and remaining in this city and returning home.
The defendant replies that the obligation of this article was satisfied by the Appropriation Act of March 3, 1857 (11 Stat. 175), appropriating the sum of $11,000.00—
* * * for the travelling and other expenses of the members of the Creek and Seminole delegations (including the agents and the interpreter for the latter) in coming to Washington, remaining, and returning home, per twenty-third article treaty seventh August, eighteen hundred and fifty-six, * * *.
The report of the General Accounting Office, however, does not show a disbursement ox this money, but it does show this disbursement of $5,155.70 for “Expenses of delegates.” Since no other expenditure is shown to fulfill this obligation, we think it fair to assume that the claimed gratuity must have been spent therefor. It results the defendant is not entitled to this offset.
Next to the last item is “Presents, $168.80.” The defendant was under no obligation to give “presents” to the plaintiff, and while it may be considered bad form to charge a “present” to the donee, the defendant is nevertheless entitled to this offset under the act of August 12, 1935.
The final item is “Provisions and other rations, $4,657.57.” The plaintiff says that this sum was spent to fulfill the obligation of article IX of the treaty of 1856, which obligated the defendant to remove to the west the Seminóles then in Florida, and to provide them with subsistence during their removal and for twelve months thereafter, and also to provide them with certain specified articles; of clothing, etc. The Florida Seminóles removed to the west in 1858.. All of the above amounts, except $300.00, were spent from 1860-1866. We hold, therefore, that the defendant is entitled to an offset on account of this item in the amount of $4,357.57.
*529 The remaining items are “Fuel, light, and water, $98.50,” “Miscellaneous agency expenses, $1,239.50,” “Pay of Indian Agents, $15,475.05,” “Pay of Interpreters, $3,910.00,” “Pay of miscellaneous employees, $158.50.” and “Transportation, etc., of supplies, $3,687.92.”
- The plaintiff points out in its brief that the treaty of 1856 required the United States to remove intruders from the Indian domain, to issue licenses to such persons as were authorized to trade within the domain, to protect them from domestic strife, hostile invasion, and from aggression from other Indians and white persons; and that the treaty also required the United States to pay the Seminóles certain sums, to pay interest on funds to be distributed per capita, to remove the Seminóles in Florida to the west, and to provide them with rations and subsistence for a certain period, and to distribute among them clothing, to pay delegations of Seminóles to Florida, and to survey the boundaries of the reservation. It says that agents, interpreters, employees and agencies were necessary in order for the United States to carry out these obligations of the treaty.
However persuasive this argument may once have been, this question has heretofore been decided adversely to the plaintiff by the cases of Blackfeet, et al. Tribes v. United States, 81 C. Cls. 101, 137, and Shoshone Tribe v. United States, 82 C. Cls. 23, 93. We hold accordingly that the defendant is entitled to these offsets.
It results that the defendant is entitled to offset $32,205.84 on account of the items set out in this finding.
4. Defendant's claim of gratuity payments as set out m Finding ffi
The plaintiff’s position with respect to the items claimed in this finding is that these sums were spent to fulfill the obligation of treaties.
The first item under this finding is “Education, $171.89.” It seems clear that the defendant is entitled to this offset.
The next item is “Expenses of delegations, $4,309.00.” We find no obligation in any treaty requiring the defendant to pay the expenses of any Indian delegation to Washington.
*530 Nor do we find any obligation on the part of the defendant to feed and care for the plaintiff’s livestock.
Items similar to the items of “Fuel, light, and water,” “Miscellaneous agency expenses,” “Pay of Indian Agents,” “Pay of interpreters,” “Pay of miscellaneous employees,” and “Transportation, etc., of supplies” have been heretofore dealt with.
The plaintiff admits that the defendant is entitled to an offset for the item of “medical attention.” We agree.
We have heretofore dealt with an item similar to the item of “Provisions and other rations.”
It results that the defendant is entitled to offset $27,720.90 on account of the items set out in this finding.
5. Defendant's claim of gratuity payments as set out in Finding 13
The defendant claims an offset of the following items set out in this finding: appraising, enrolling, preservation of records, probate expenses, protecting property interests, sale of town sites, surveying, surveying and allotting, and traveling expenses. The plaintiff takes the position that the defendant incurred these expenses in carrying out the obligations of its agreements with the plaintiff.
By the treaty of August 7, 1856 (11 Stat. 699), certain lands were granted to the Seminóles west of the Mississippi River to be held by the tribe in common. In article IV of that treaty it was provided that no portion of the land conveyed “shall ever be embraced or included within, or annexed to, any Territory or State, nor shall * * * ever be erected into a Territory without the full and free consent of the legislative authority of the tribe owning the same.” That same treaty in article XY provided that the “Seminóles shall be secured in the unrestricted right of self-government, and full jurisdiction over persons and property, within their respective limits; * *
However, by 1893 white people had crowded into this Indian reservation in such numbers that they far outnumbered the Indians and so it became desirable, if not imperative, to abolish the tribal governments in this territory and *531 to bring it under the dominion of the laws of the United States.
In view of this situation, Congress, on March 3, 1893, passed an act (27 Stat. 645) appointing a commission to enter into negotiations with the tribes—
* * * for the purpose of the extinguishment of the national or tribal title to any lands within that Territory * * * either by cession of the same or some part thereof to the United States, or by the allotment and division of the same in severalty among the Indians of such nations or tribes, * * * with a view to such and [an] adjustment * * * as may * * be requisite and suitable to enable the ultimate creation of a State or States of the Union which shall embrace the lands within said Indian Territory.
The act directed the commissioners to undertake to secure an agreement from the Indian tribes permitting an allotment of the lands in severalty, upon the accomplishment of which they were directed to “cause the lands of any such nation or tribe or band to be surveyed, and the proper allotment to be designated.” The amount of $50,000 was appropriated for the carrying out of the commission.
Acting under the authority thereby vested, the commission entered into agreements with the various tribes in the Indian territory providing for the- allotment of the tribal lands to the members of the tribe. The agreement with the Seminóles was ratified on July 1, 1898 (30 Stat. 567). Under that agreement it was provided “that all lands belonging to the Seminole tribe of Indians * * * shall be divided among the members of the tribe so that each shall have an equal share thereof in value * * *. Such allotment shall be made under the direction and supervision of the commission to the Five Civilized Tribes in connection with the representative appointed by the tribal government. * * *” This agreement further provided for the exclusion from lands to be allotted of certain coal, mineral, oil, and natural gas lands, etc., for the leasing and sale thereof, and for the payment to the individual members of the tribe of the proceeds thereof, together with such other money as might be in the hands of the United States belonging to the tribe.
*532 There was no express provision in the Seminole agreement that the United States should bear the expense of the allotment of the Seminole lands, and the majority of the Court is of the opinion that an obligation to do so cannot be implied. Choctaw Nation v. United States, 91 C. Cls. 320.
We hold, accordingly, the defendant is entitled to an offset of the above-mentioned items.
The plaintiff seems to admit that the defendant is entitled to an offset for the following items: clothing, expenses of delegates, livestock, medical attention, provisions and other rations. We think it is.
We have heretofore dealt with items of general office expenses, miscellaneous agency expenses, pay of miscellaneous employees, and per capita payment expenses. This leaves in dispute the item “Education, $20,377.89.”
In 1904, according to the report of Special Agent Churchill, appointed by the Secretary of the Interior,[1] there were upwards of 100,000 persons of school age residing in the Indian territory who were not eligible to attend the tribal schools and were without free education.
By the Act of April 21,1904 (33 Stat. 189, 215) Congress appropriated $100,000 for the maintenance, strengthening and enlarging of the tribal schools of the Creek, Cherokee, Chickasaw, Choctaw and Seminole Nations. Provision was made for the attendance of children of noncitizens. From that time on the schools in the territory were maintained both for members of the tribes and also for white people and negroes who were not members of the tribes. The report of the Commissioner of Indian Affairs in 1906, pp. 129-131, shows that in the fiscal year ending June 30, 1906, there were enrolled in the various schools in Indian territory 10,832 Indians, 43,011 whites, and 6,104 negroes. The schools were maintained both by appropriations from Congress and also by tribal funds. (See report of the Commissioner of Indian Affairs for 1905, p. 108.)
Since these sums were spent not only for the benefit of the plaintiff, but also for the benefit of white and negro *533 children, it is manifestly improper to charge them against the plaintiff as gratuities, especially since tribal funds were contributed to the support of the schools.
It results that the defendant is entitled to an offset of the. amounts listed in finding 13 in the sum of $32,309.21. (Amended.)[1]
6. Amounts claimed as offsets, as set out in Findings 15, 17 and' 18
In findings 14' and 15 the defendant seeks an offset of 15 per cent of the amounts spent for the joint benefit of the Seminole and Creek Indians, on the theory that the members of the Seminole Nation comprised about 15 per cent of the total population of the Creek and Seminole tribes. The proof does not show how much of the aggregate amount was actually spent for the benefit of the Seminóles and how much for the benefit of the Creeks, but on the basis of prior decisions of this court and of the Supreme Court (see The Sisseton and Wahpeton Bands of Indians v. United States, 42 C. Cls. 416, 429; 208 U. S. 561, 567) the defendant would be entitled to an offset of 15 per cent of the total amount spent, since the membership in the Seminole tribe was 15 per cent of the total membership of the Creeks and Seminóles. This amounts to $513.74.
Defendant also seeks an offset of éy2 per cent of the amounts set out in findings 17 and 18, which were spent for the benefit of the Creek, Cherokee, Choctaw, Chickasaw, and Seminole Nations, because the members of the Seminole tribe are said to haye composed. approximately 4% per cent of the total population of all the tribes. As in the case of amounts spent for the Creeks and Seminóles jointly, there is no proof as to what percentage of the amount spent for these five tribes was actually spent for the benefit of the Seminóles, but the proof does show that from 1861 to 1928 the Seminóles composed about 3.72 per cent of the total population of the five tribes. On the basis of the decisions cited supra the defendant is therefore entitled to an offset of 3.72 per cent of the total amount spent for the items listed in findings 17 and 18, amounting to $436,034.57.
Mr. Paul M. Niébell for the plaintiff. Mr. W. W. Pryor was on the briefs.
Mr. Wilfred Hearn, with whom was Mr. Assistant Attorney General Norman M. Littell, for the defendant. Mr. Raymond T. Nagle was on the brief.
It results that the plaintiff is entitled to recover of the defendant the sum of $16,598.30 (amended) ,[1] made up of the following items:
Plaintiff's second amended petition:
Paragraph III, findings 3 and 4 (amended) [1]_ $0.00
” IV, finding 5_13, 501.10
” V, ” 6_ 3,097.20
” VI, ” 7_ 0.00
” VII, ” 8_ 0.00
Total_ 16, 598. 30
and that the defendant is entitled to an offset against this of $725,715.22, made up of the following items:
Finding 9-$31,083.79
” 10_ 165, 847.17
” 11_ 32,205. 84
” 12 — __ 27,720.90
” 13 (amended)[1]_ 32,309.21
Findings 14 and 15- 513. 74
” 17 and 18_ 436, 034. 57
Total_ 725,715.22
Plaintiff’s petition must therefore be dismissed. It is so ordered.
Littleton, Judge; Green, Judge; and Whaley, Chief. Justice, concur.
ON MOTION FOR A NEW TRIAL
(Decided May 5,1941)
Whitaker, Judge,
delivered the opinion of the court:
1. The plaintiff in its motion for a new trial says that in our opinion filed on January 6, 1941, we misconstrued the *535 provision of article IX of the treaty of August Y, 1856. It says the expression “after they shall all remove” refers to all of those Seminóles who could be induced to remove, and not to all of the Seminóles in Florida. Upon reconsideration we conclude that plaintiff is right. Under this article the United States agreed to remove to the country west “all those Seminóles now in Florida who can be induced to emigrate thereto.” It also agreed to furnish “them” with sufficient rations during “their” removal and for twelve months after “their” arrival at “their” new homes. The words “them” and “their” refer, of course, to those Seminóles who had been induced to emigrate. So, when it was agreed, in conclusion, to “expend for them in improvements after they shall all remove the sum of twenty thousand dollars,” the parties had reference to those Seminóles who could be induced to remove, and not to all the Seminóles in Florida. It is clear that when the treaty was agreed upon the parties contemplated that all of the Seminóles in Florida could not be induced to remove. Surely the defendant did not mean to agree to spend the $20,000 only on a condition it believed would never be met.
But, it has been suggested that, even though the obligation to spend this $20,000 in improvements arose on arrival in their new homes of all those Seminóles who could be induced to remove, yet the plaintiff is not entitled to recover, because that was an agreement for the benefit of individual Indians and not for the benefit of the tribe as a whole. The agreement was to spend for the immigrant Florida Seminóles $20,000 in improvements. It is not expressly stated whether the improvements to be made were public or private improvements, that is, whether they were to be for the common benefit of the Indians as a whole, or for the benefit of each individual ; but we assume they were for the common benefit, since no individual owned any particular parcel of land, but all of them owned it all in common.
Does the fact that these improvements were to be for the benefit of the immigrant Florida Seminóles prevent the plaintiff nation from suing to recover the unexpended portion thereof? The Florida Seminóles after their arrival at the Seminole reservation in the west were no longer, if ever, *536 a separate entity. On arrival they became amalgamated with the other members of the tribe and lost whatever identity they may have had. Whatever improvements were made with the $18,210.00 that was spent were not set apart for the exclusive use of these Florida Seminóles but inured to the benefit of the whole tribe. No doubt the newcomers were quartered on arrival in an unoccupied part of the reservation, and the improvements were made there and so inured particularly to their benefit; but there is nothing to show that they were intended for their exclusive benefit. Improvements on the entire reservation were enjoyed by the entire tribe in common. The newcomers had an interest in the improvements already on the reservation in common with the other members of the tribe, and the earlier arrivals had an interest in the improvements made on the lands occupied by the newcomers in common with them. Neither any individual among those who emigrated from Florida, nor the group as a whole acquired title to these improvements to the exclusion of the other members of the tribe.
From the foregoing it seems clear that the cases of Cherokee Nation v. United States, 80 C. Cls. 1, Sioux Tribe v. United States, 89 C. Cls. 31, and Blackfeather v. United States, 37 C. Cls. 233; 190 U. S. 368, have no application. The Cherokee case was brought by only a portion of the tribe and for their benefit to the exclusion of other members of the tribe, and the Sioux case was grounded on a failure to pay certain individuals what they were individually entitled to, as was also the Blackfeather case. In the Cherokee case the suit was brought by the Cherokees by blood for their benefit to the exclusion of the Cherokees by adoption. In the Sioux Tribe case the suit was to recover amounts to which individual members were entitled when they devoted their allotments to agricultural purposes. The Blackfeather case was brought for the benefit of the individual members of the tribe whose property had been damaged or destroyed by depredations.
It results that the plaintiff is entitled to recover the unex-pended balance of the $20,000, or $1,790. The opinion heretofore filed on January 6, 1941, is amended in accordance herewith.
*537 2. In our opinion filed on January 6, 1941, we field tfiat tfie defendant was entitled to an offset of all the items listed in finding 13, except the item of “Education, $20,377.89.” By inadvertance, however, we failed to deduct this amount from the total of the ■ items set out in this finding. Accordingly, the figures “$32,309.21” in the last line of the second full paragraph of the opinion on page 31.must be eliminated and the figures “$11,931.32” substituted therefor. The thirteenth finding on page 10 of the opinion will be amended by striking the word “gratuitously” in the third line thereof, putting a comma in the place of the colon at the end of the fourth line thereof, and adding after the comma the following: “all of which, except $20,377.89 for education, was spent gratuitously
The foregoing changes will make the second to the last paragraph of the opinion read as follows:
It results that the plaintiff is entitled to recover ox the defendant the sum of $18,388.30, made up of the following items:
Plaintiff’s second amended petition:
Paragraph III, findings 3 and 4-$1, 790.00
“ IV, finding 5_13,501.10
“ V, “ 6_ 3,097.20
“ VI, " 7_ 0.00
“ VII, “ 8_ 0.00
Total_ 18,388.30
and that the defendant is entitled to an offset against this of $705,337.33, made up of the following items:
Finding 9_$31,083. 79
“ 10_ 165, 847.17
“ 11_ 32,205.84
“ 12_ 27, 720. 90
“ 13_ 11,931. 32
Findings 14 and 15_ 513. 74
“ 17 and 18_ 436, 034. 57
Total_ 705,337.33
The plaintiff’s motion for a new trial is allowed and the former findings of fact and opinion are amended in accordance with the foregoing opinion. It is so ordered.
Giseen, Judge,/ Littleton, Judge/ and Whaley, Chief Justice, concur.

 See opinion on motion for new trial, infra:

 Annual Reports of Commissioner of Indian Affairs : 1870, pp. 212-213; 1877, pp. 690-691; 1878, pp. 286-287; 1879, pp. 341-342; 1881, pp. 280-281; 1883, pp. 90, 250 — 251; 1844, pp. 270-271; 1886, pp. 146, 154 ; 1887, pp. 9S, 110 ; 1888, pp. 113, 122; 1890, pp. 89, 94; 1891, pp. 240, 250; 1892, pp. 247, 256; 1893, pp. 143, 147; 1894, p. 140; 1895, pp. 155, 161; 1896, pp. 151-158.

 House Document No. 522, 57th Cong., 1st sess., pp. 9, 32.

 See opinion on motion for new trial, infra.

 See opinion on motion for new trial, infra.