Laura **HEBAH**, Administratrix, in the Matter of the Estate of Robert Hebah, Deceased

v.

The **UNITED STATES.**

No. 325–69.

United States Court of Claims.

July 15, 1970.

---

G. L. Spence, Casper, Wyo., attorney of record, for plaintiff. H. S. Harnsberger, Jr., Riverton, Wyo., of counsel.

John E. Lindskold, Washington, D. C., with whom was Asst. Atty. Gen., Shiro Kashiwa, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON DEFENDANT'S MOTION TO DISMISS THE PETITION

DAVIS, Judge.

In February 1869 President Andrew Johnson proclaimed a Treaty between the United States and the Eastern Band of Shoshonees and the Bannack Tribe of Indians. Treaty of July 3, 1868, 15 Stat. 673. One of the treaty clauses, in Article I, provided:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.[1]

1. Article I reads as follows in full text:
   "*Article I.* From this day forward, peace between the parties to this treaty shall forever continue. The government of th United States desires peace, and its honor is hereby pledged to keep it. The Indians desire peace, and they hereby pledge their honor to maintain it.

   "If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

   "If bad men among the Indians shall commit a wrong or depredation upon the

Relying on this provision, plaintiff, the widow and administratrix of Robert Hebah, a Shoshone, has brought suit in this court to recover damages for his death in 1968 on the Wind River Indian Reservation, in Wyoming. Her petition asserts that Mr. Habeh was unlawfully and wrongfully attacked and killed at his home on the reservation by members of the Indian Police Force, and that the officer who killed him was a "bad man" in the sense of the Treaty.[2]

person or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith, the Indians herein named solemnly agree that they will, on proof made to their agent and notice by him, deliver up the wrong-doer to the United States, to be tried and punished according to its laws; and in case they wilfully refuse so to do, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under ·this or other treaties made with the United States. And the President, on advising with the Commissioner of Indian Affairs, shall prescribe such rules and regulations for ascertaining damages under the provisions of this article as in his judgment may be proper. But no such damages shall be adjusted and paid until thoroughly examined and passed upon by the Commissioner of Indian Affairs, and no one sustaining loss while violating or because of his violating the provisions of this treaty or the laws of the United States shall be reimbursed therefor."

2. The petition alleges the circumstances of the killing as follows:

"9. That on the 14th day of March, 1968, Robert Hebah was shot by Norman Moss, and as a result of the wound inflicted, he died on the 14th day of March, at Salt Lake City, Utah, where he had been flown for emergency care and treatment after the aforesaid gunshot wound had been inflicted. Moss, in acting as an officer of the Indian Police Force on the Wind River Indian Reservation shot the decedent while decedent was helpless. He had been tear gassed from his home by members of the Indian Police Force, and at the time Moss shot the decedent, the decedent was blind, unable to breathe, and was attempting to escape the gas which had been wrongfully used by officers of the Police Force in the home of decedent.

"As the decedent tried to escape the gas through the front door of his home, he was shot without warning by the said Moss, who with the other officers, including the Chief of Indian Police and the Special Officer in charge of the Police Force, Harry Svela, and who is an employee of the Bureau of Indian Affairs, an agency of the United States Government, were hiding behind a concrete abutment approximately 8 feet away from the decedent at the time he was shot. The shooting was not included as a necessary part of the arrest of the decedent for any crime. No warrant had been issued and no crime committed by the decedent in the presence of said officers. The officers had wrongfully trespassed into the home of the deceased, and had attempted to arrest the decedent in his said home for a supposed crime which had never been committed in their presence, if, indeed, any crime had been committed by the decedent. The actions of the officers, under the supervision of the Superintendent, acting in the scope of their authority, therefore, were unlawful and willfully in violation of the rights of the said decedent.

"10. The shooting of said decedent was a willful and unnecessary act by the said Moss under the supervision and control of the United States Government and their employees and was the use of unnecessary force for any lawful purpose; constituted an abuse of the authority and power vested in the government employees, and police officers; constituted a willfull and malicious act; constituted an intentional assault on the person of the deceased, and therefore was a wrong committed upon the person of said Indian.

"11. The said Moss is a 'bad man' among the whites and among other people subject to the authority of the United States in that he, while committing the aforesaid, was a member of the Indian Police, and as such member of the said Police Force, he is subject to the authority of the United States through the Superintendent of the Indian Reservation, who, in accordance with the laws of the United States, is the commander of the said Police Force and is responsible for the general efficiency and conduct of the members thereof. The said Moss has long been known as a 'bad man' among the police officers of the Indian Police Force, and has on numerous occasions breached the peace, assaulted helpless persons, used unnecessary force, has exhibited propensities for cruelty, maliciousness, sadism and destructiveness, and as a result of the aforesaid prior acts of the nature described above, and because of the aforesaid malicious, unnecessary killing of the dece-

The Government has moved to dismiss the petition on its face, urging that (a) the treaty provision plaintiff invokes gives no rights to individual Indians, but solely to the tribe itself, and (b) in any event, this court has no jurisdiction over a claim filed by an individual Indian which is based on an Indian treaty. We deny the motion and remand the case to the trial commissioner for trial or other appropriate proceedings on the merits.

■ A. The initial question is whether the 1868 Treaty with the Shoshone Tribe gives any rights to the plaintiff, an individual Indian who sues in her own behalf and that of her children.[3] The very great majority of Indian treaties create tribal, not individual, rights, and the usual statements in the books are to that effect. In Blackfeather v. United States, 190 U.S. 368, 377, 23 S.Ct. 772, 776, 47 L.Ed. 1099 (1903), the Supreme Court said, affirming and quoting from this court (37 Ct.Cl. 233 (1902)):

> The United States, as the guardian of the Indians, deal with the nation, tribe, or band, and have never, so far as is known to the court entered into contracts either express or implied, compacts, or treaties with individual Indians so as to embrace within the purview of such contract or undertaking the personal rights of individual Indians.

This principle has been carried into effect even where a treaty provided for financial payments to specified beneficiaries out of annuities paid to the tribe; the holding was that, nevertheless, individual rights against the Federal Government were not created by the treaty. Sac and Fox Indians of Mississippi in Iowa v. Sac and Fox Indians of Missis-

sippi in Okl., 220 U.S. 481, 484, 486, 487, 489, 31 S.Ct. 473, 55 L.Ed. 552 (1911), aff'g 45 Ct.Cl. 287, 300–301, 304 (1910). See, also, Seminole Nation v. United States, 93 Ct.Cl. 500, 518–519, 536 (1941), rev'd in part on other grounds, 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942).

But this court has also indicated that the principle is not universal or without exception—that some few Indian treaties did confer individual rights. In Sioux Tribe of Indians v. United States, 89 Ct.Cl. 31 (1939), the *tribe* sought to recover under a treaty article providing that the head of a family or lodge who commenced farming in good faith "shall be entitled to receive seeds and agricultural implements for the first year, not exceeding in value one hundred dollars, and for each succeeding year he shall continue to farm, for a period of three years more, he shall be entitled to receive seeds and implements as aforesaid, not exceeding a value of twenty-five dollars." One of the grounds on which the court rejected the tribe's claim was that "the plaintiff tribe cannot maintain suit and recover on this character of claim for the reason that it is not a tribal claim but concerns the rights of and obligations to individual Indians members of the Sioux Tribe." 89 Ct.Cl. at 38. See Seminole Nation v. United States, *supra*, 93 Ct.Cl. at 536.

So here, we think that Article I of the 1868 Treaty, *supra*, "concerns the rights of and obligations to individual Indians, members of the [Shoshone] Tribe." The different type of pact in *Blackfeather, Sac and Fox,* and *Seminole, supra,* called for sums to be paid to and through the Indian group as a unit, even though ultimate beneficiaries may have been specifically designated; the primary re-

---

dent, the said Moss is a 'bad man' and is subject to the authority of the United States."

3. There is an allegation in the petition that the claim is also made on behalf of "all of those persons related by blood or tribal rite who by Indian custom are sadly aggrieved and bereaved, and who have suf-

fered loss by reason of the death of Robert Hebah." Since there is no showing or assertion that the Shoshones, as a tribe, have properly authorized this action, we do not accept this naked and summary statement as equivalent to the presentation of an authorized claim by or on behalf of the tribe itself.

cipient was still the tribe or band. Here, in contrast, the obligation and payment both run directly to the individual—as the court held was also true in *Sioux Tribe, supra.*[4] The treaty promise is (note 1, *supra*):

> * * * the *United States will* * * proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and *also reimburse the injured person* for the loss sustained * * * (emphasis added).

The tribe is not to be the channel or conduit through which reimbursement is to flow. Rather, "the United States will * * * also reimburse the injured person [directly] for the loss sustained." The obligation and the right are each individual and personal.[5]

■ Of course, the treaty was made by the United States with the tribe, and not with individual Shoshonees. But the accepted theory of third-party contractual beneficiaries suffices to give plaintiff, and others similarly situated, legal rights to vindicate and enforce the Federal Government's promise. See Crumady v. Joachim Hendrik Fisser, 358 U.S. 423, 428, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Restatement of Contracts, § 133(1); Restatement (Second) of

Contracts (Tentative Draft No. 4 § 133 (1968)). In the current formulation of Restatement (Second) of Contracts, the injured Indian is an "intended beneficiary" of Article I because recognition of his rights is appropriate to effectuate the intention of the treaty-parties, and the Federal Government's promise of redress and reimbursement manifests an intention to give those benefits to the "injured person" himself, directly. This liberal interpretation, which serves to advance and protect the rights accorded by Article I, is supported by the established principle that Indian treaties should be read, where possible, generously in favor of the Indians. Peoria Tribe v. United States, 390 U.S. 468, 472–473, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968); Choctaw Nation v. Oklahoma, 397 U.S. 620, 631, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970).

■ B. Even so, says the defendant, this court has not been given jurisdiction to entertain plaintiff's claim. Under 28 U.S.C. § 1505,[6] the claimant must be a "tribe, band, or other identifiable group of American Indians"—not, as here, an individual Indian. *Cf.* Klamath and Modoc Tribes v. United States, 174 Ct.Cl. 483, 488–490 (1966). But on its face 28 U.S.C. § 1491[7]—our basic

---

4. It is interesting that both the treaty in *Sioux Tribe* and that at issue in this case were among the last entered into by the United States with the Indians. Both were made in 1868. A rider in the Indian Appropriation Act of March 3, 1871, 16 Stat. 544, forbade further treaties with the Indians, and there had been earlier efforts in the later 1860's to terminate such treaty-making. See *Federal Indian Law* (1958), pp. 114, 138, 210–12, 236.

5. Congress treated the last portion of Article I of the 1868 Treaty (*supra*, note 1), which in parallel fashion concerned injuries inflicted on others by "bad men among the Indians", as conferring individual rights on the injured non-Indian person. Provision was first made for administrative determination of those and other like claims (Act of March 3, 1885, 23 Stat. 362, 376), and then, in the Indian Depredation Act of 1891, 26 Stat. 851, for determination by this court of such

claims filed by individual claimants. See Johnson v. United States, 160 U.S. 546, 16 S.Ct. 377, 40 L.Ed. 529 (1896); Marks v. United States, 161 U.S. 297, 16 S.Ct. 476, 40 L.Ed. 706 (1896).

6. "The Court of Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Claims if the claimant were not an Indian tribe, band or group."

7. "The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act

jurisdictional charter—would seem to give us power to hear and decide this individual claim. Unlike § 1505, that broad statute is not limited as to the class of plaintiffs who may sue, and Mrs. Hebah's case is founded either upon an "Act of Congress" (if the treaty can be so characterized) or, at least, upon an "express or implied contract with the United States", *i. e.* Article I of the 1868 Treaty. Nothing in the terms or structure of § 1491 precludes our jurisdiction. It is settled, moreover, that an intended third-party beneficiary of a government contract may sue under § 1491. Maneely v. United States, 68 Ct.Cl. 623, 629 (1929); Deltec Corp. v. United States, 326 F.2d 1004, 164 Ct.Cl. 432 (1964); United States v. Huff, 165 F.2d 720, 723–724 (C.A. 5, 1948)[8].

Nevertheless, says defendant, § 1491 is inapplicable because history shows that, regardless of the broad coverage of its language, the section does not actually grant authority over any demand arising out of Indian treaties. This position is founded on the former statute excepting from this court's jurisdiction claims growing out of a treaty with an Indian tribe. The Act of March 3, 1863, 12 Stat. 765, 767—which first gave the court power to render judgment—provided:

> [T]he jurisdiction of the said court shall not extend to or include any claim against the Government not pending in said court on [December 1, 1862], growing out of or dependent on any treaty stipulation entered into

with foreign nations *or with the Indian Tribes* (emphasis added).

This became 28 U.S.C. (1940 ed.) § 259 and then 28 U.S.C. § 1502 (1948 ed.) (62 Stat. 869, 942). Until 1946, claims arising out of Indian treaties were maintained in this court under special jurisdictional acts passed by Congress from time to time. See Handbook of Federal Indian Law (1942), pp. 373–78; Federal Indian Law (1958), pp. 344–56.

When Congress enacted the Indian Claims Commission Act of 1946, 60 Stat. 1049, it created, in § 24 of that statute (60 Stat. 1055), the provision which later became 28 U.S.C. § 1505, *supra*, note 6. For claims accruing after the date of the Claims Commission Act (August 13, 1946), in favor of a tribe, band, or other identifiable group of American Indians, this court was to be the forum, if the demand would be cognizable here were the claimant not an Indian tribe, band, or group. Since the Claims Commission Act (in § 25, 60 Stat. 1056) declared that "[a]ll provisions of law inconsistent with this Act are hereby repealed to the extent of such inconsistency [with an immaterial exception]", the part of 28 U.S.C. § 1502, *supra* (then designated as 28 U.S.C. § 259) which deprived this court of general jurisdiction over claims by tribes or groups, growing out of Indian treaties, was necessarily repealed to the extent of the conflict with § 24. In 1949, this modification was made, more formally, by the Act of May 24, 1949, 63 Stat. 89, 102, §§ 88–89, which turned § 24 of the Indian Claims Commission

---

of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. "Nothing herein shall be construed to give the Court of Claims jurisdiction in suits against, or founded on actions of, the Tennessee Valley Authority, nor to amend or modify the provisions of the Tennessee Valley Authority Act of 1933, as amended, with respect to suits by or against the Authority."

8. The converse case of injuries inflicted by Indians on whites (see notes 1, 5, *supra*)

did not come under the predecessor of § 1491 because (a) until 1949, the exception for claims arising out of Indian treaties still governed all of this court's general jurisdiction, (b) the 1868 Treaty did not make the United States liable for these injuries as it made the United States responsible for injuries inflicted by "bad men" on the Indians, and (c) Congress and the Treaty first established an exclusively administrative process for these claims, and later Congress passed a special jurisdictional act for this court, thus indicating affirmatively that our general jurisdictional statute should not be used.

Act into § 1505 of Title 28, and also deleted entirely the words "or with Indian tribes" from 28 U.S.C. § 1502.[9]

Since 1949, accordingly, there has been no exception whatever on the face of our jurisdictional legislation for claims arising out of Indian treaties. Defendant's argument is that, although the exception is obviously non-existent for group claims brought under 28 U.S.C. § 1505, we must still read the old exclusion for Indian treaties into 28 U.S.C. § 1491, permitting individual claims. It is said that, despite what Congress wrote, it intended only to cut down that exception to exactly the same extent that it had affirmatively granted jurisdiction in what is now § 1505—to tribes, bands, or other such groups.

We decline to accept this contention. The exclusion for claims based on Indian treaties was wholly repealed in 1949, without any qualification or limitation. Undoubtedly, Congress was thinking, in the main, of group claims because that is the kind of case which would primarily be brought in the future as in the past. But we do not believe that, if the possibility of an individual claim under § 1491 based on a treaty had been specifically raised, Congress would have reframed its repealer to cover only group causes of action. There would be no reason for such a restriction, once it had been decided (as it was in § 24 of the Indian Claims Commission Act) to give this court general and continuing jurisdiction of "legal" Indian claims against the Federal Government. On the contrary, to continue the treaty exception for individual Indian claims against the United States would have meant that, without a shadow of justification, those Indian cases alone would be barred from all remedy in any judicial tribunal. Certainly in a case in which the words do not compel it, we should not attribute such

haphazard discrimination to Congress. It is far better to take the repealer at its word and to consider the Indian-treaty exclusion as gone for all purposes.

We hold, therefore, that this court has jurisdiction under 28 U.S.C. § 1491 of plaintiff's claim.

C. The Government's motion raises no defenses other than those we have already discussed in this opinion. The merits of plaintiff's claim are not before us, and we do not pass upon them except for two legal issues which should be set to rest before a trial is undertaken.

■ We have been informed that the alleged "bad man," Norman Moss (see note 2, *supra*), a member of the Indian Police Force, is himself an Indian. In addition to whites, the treaty provision, *supra*, covers "bad men * * * among other people subject to the authority of the United States." Members of the Indian Police Force are appointed by and subject to the Department of the Interior (25 C.F.R. §§ 11.301–11.306), and are therefore within this provision regardless of their race or color.

■ The other point relates to the treaty requirement (note 1, *supra*) that a wronged Indian shall make proof to the "agent", which proof shall be "forwarded to the Commissioner of Indian Affairs at Washington City." The petition alleges that claim was made upon the Superintendent of the Wind River Indian Agency and a copy sent to the Commissioner of Indian Affairs in Washington. If those assertions are true, plaintiff has fulfilled the only prerequisite to suit required by the treaty, and all administrative remedies have been exhausted.

For these reasons, defendant's motion to dismiss the petition is denied, and the case is remanded to the trial commissioner for trial or other further proceedings on the merits.

---

9. The Act of May 24, 1949, *supra*, was a general technical statute conforming various provisions of the United States Code to recently enacted legislation, and correcting technical errors or gaps.